45 281
82 133

## The Board of Supervisors of Milwaukee County vs. Ehlers and others.

OFFICIAL BOND: CONSTRUCTION OF STATUTES. *(1) Liability of sureties on
general bond of officer, for special duties subsequently imposed: general
rule. (2, 3) Case of Milwaukee county treasurer: Court-house fund:
Acts of 1871 and 1874.*
REFEREE: OATH: PRACTICE. *(4) Referee's failure to take oath: Waiver.
(5) His failure to report all the evidence: How objection to be taken.*

1. The general rule is, that where an officer is required to perform a duty
special in its nature, and to give a special bond for its faithful perform-
ance, no liability therefor attaches to his general bondsmen, in the absence
of any declaration that they shall also be liable.
2. In view of all the provisions of ch. 400,P. & L. Laws of 1871, and the construc-
tion apparently put upon that act by ch. 178, Laws of 1874, this court is of
the opinion that it was the intention of the legislature, in the former act,
not to impose upon the general bondsmen of the treasurer of Milwaukee
county any responsibility for the safe-keeping and disbursement of the
special " court-house fund " provided for by that act, but to limit such
responsibility to the makers of the new bond there required; and the
provision of sec. 3, that "the said treasurer *and his sureties* shall be
liable to said county for any misapplication of the same or any part of
such special fund," must be construed as referring to the sureties on the
special bond there required to be given.

3. The act of 1871 must also be construed as requiring the special bond there described, not only from the county treasurer who was charged with the negotiation of the court-house bonds, but from his successors in office during the existence of said " court-house fund."

4. If it is irregular for a referee to hear and try a case without first having taken the oath of office, yet that objection cannot be heard here when the record does not show that the referee *did not* take such oath; and a party who, knowing that the referee has not taken such oath, proceeds to trial without objection on that ground, thereby *waives* the objection.

5. The objection that the referee's report does not contain all the evidence, cannot be first taken in this court; but the question must first have been brought before the court below by motion (founded on affidavit showing the fact) for an order requiring him to return all the evidence, and for a stay of proceedings on the motion to confirm the report until such order is complied with.

APPEAL from the Circuit Court for *Kenosha* County.

The case is thus stated by Mr. Justice TAYLOR:

This action is brought upon the bond of *Edward Ehlers*, late treasurer of the county of Milwaukee, to recover of the sureties in said bond the sum of $10,150.30, for which sum it is alleged the late treasurer was a defaulter, and which he had failed to pay over to his successor in office.

The answer is a general denial. There is no dispute upon the evidence as to the fact that *Ehlers* was a defaulter in his accounts as treasurer, to the amount claimed by the plaintiffs; but it is insisted that the defendants are not liable upon their bond to make good the amount to the county.

The main point of the defense is, that the default did not occur in the general funds belonging to the county, which came to *Ehlers'* hands as treasurer. It is alleged that the evidence very clearly establishes the fact that *Ehlers* paid out all such funds in the manner prescribed by law, and that the deficiency exists in what is called the " court-house fund." The defendants claim that for any misappropriation of that fund by *Ehlers* they are not liable. The grounds of the defense are, that by law *Ehlers* was bound to give a special bond to the county to protect it against any misappropriation of this particular fund, and that he did give such special bond, which was accepted and approved by the proper officers of the county.

The statute under the provisions of which the treasurer became entrusted with the special " court-house fund," and by virtue of which the county board of the county required him to give the special bond referred to, is ch. 400, P. & L. Laws of 1871, as amended by ch. 40, P. & L. Laws of 1872, entitled "An act to empower the county of Milwaukee to raise money to build a court house." The act of 1871, as amended by that of 1872, authorized the county board of supervisors of the county of Milwaukee to issue the bonds of said county to an amount not exceeding $200,000, to be payable in not less than ten years after date, with interest at not less than five nor more than eight per cent., payable annually; and to sell such bonds, and use the proceeds thereof in building a court house for said county. The act expressly provides that the county treasurer shall keep the funds arising from the sales of such bonds separate and apart from all other funds in his hands, and pay them out only upon orders drawn upon him which shall contain the words, " on court-house contract." Sections 3, 5 and 9 of ch. 400, P. & L. Laws of 1871, are the only parts of the act which have any bearing upon the point in controversy. Sec. 3, after authorizing the issue of the bonds, proceeds as follows: "And it shall be the duty of the treasurer of the county of Milwaukee, under the supervision of said county board of supervisors, to negotiate the bonds so to be issued; *provided*, that none of the said bonds shall be sold at a rate less than par; and the said county treasurer shall keep and maintain all moneys received from the sale of the bonds so to be issued, in a fund separate from all other moneys belonging to said county, and no part of the said bonds, or of the money arising from the sale thereof, shall be expended for or applied to any purpose except to defray the expense of building a court house for said county; and the said treasurer and his sureties shall be liable to said county for any misapplication of the same or any part thereof; and the said treasurer, before he shall receive said bonds for any purpose whatever, shall execute to the county board of supervisors of said county a bond, with three or more sufficient sureties, in the penal sum of double the amount of the bonds so to

be received by him, conditioned that he will perform faithfully all orders and resolutions of said county board of supervisors which may be passed by virtue of the powers conferred upon said board by this act; that he will keep the bonds received by him safely; that he will keep the moneys received by him, and arising from the sale of said bonds, safely and separately from other moneys belonging to the said county of Milwaukee; and that he will not pay·out the same, nor any part thereof, except in the manner herein provided; which said ·bond shall be approved by the county board of supervisors of said county, and filed in the office of the clerk of said county board of supervisors."

Sec. 5 provides for the form of the orders to be drawn upon this fund, and prohibits the chairman of the board and the county clerk from signing any orders on this fund, unless the consideration for such order be for work done, or materials furnished, or both, in·the construction of the court house. Sec. 9 provides that the treasurer, for all the duties which he shall perform under the act, shall receive not exceeding one-half of one per cent. of the amount of bonds disposed of by him, in addition to the salary fixed by law for other duties by him performed as treasurer of said county. It then contains the following: " *Provided, however*, the county board of supervisors of said county are hereby empowered to employ any other person, or any corporation, instead of the said treasurer, to negotiate the whole or any portion of said bonds, upon such person or corporation giving such security as is herein required of the county treasurer of said county, to be approved in like manner by the said board, and to pay such other person, or such corporation, for such services, not exceeding one-half of one per cent. for the amount of bonds negotiated by him or it."

The evidence shows that at the commencement of *Ehlers'* term of office, all the bonds had been sold and converted into money, and that there remained in the hands of his predecessor in office, of·said funds unexpended, the sum of $94,073. It also appears that his predecessor, by the direction of the

board of supervisors, refused to pay over to *Ehlers* the moneys belonging to this fund, until he executed a bond as prescribed by sec. 3 of said ch. 400, P. & L. Laws of 1871, in addition to the ordinary bond of the treasurer; that *Ehlers* gave the special bond required, which was approved by the proper authorities of the county, and thereupon the special "court-house fund" was paid over to him by his predecessor in office. The evidence further shows that the whole of said special fund was paid out and expended for the construction of the court house, except the sum of $12,564.84, previous to the 7th day of March, 1874, at which time the said court house was completed, and this sum of $12,564.84 remained as a surplus arising from the sale of said bonds, and not expended for the purposes for which the bonds were issued; and thereafter the legislature, on the 7th day of March, 1874, enacted ch. 178, Laws of 1874, directing that the unexpended moneys belonging to said court-house fund be turned over to the general fund of the treasury of said county, and made a part thereof, "and that the treasurer and his sureties be, and they are hereby made, liable for said money the same as any other money in said fund."

The learned counselor who acted as sole referee in this case, found as a fact, "that prior to the 7th of March, 1874, the said *Edward Ehlers*, of the moneys so received from the sale of court-house bonds, and being part of said sum of $94,073, converted and appropriated to his own use the sum of $10,150.-30; that the defendant *Edward Ehlers* did not convert or appropriate to his own use any other moneys, save such as were part of said sum of $94,073, and which were derived from the sale of bonds issued under said acts."

And as a conclusion of law, he held "that the defendants are not liable to the plaintiff for the conversion and appropriation, by *Edward Ehlers*, of the moneys so converted by him pertaining and belonging to the court-house fund, so called, being part of the said sum of $94,073; and that the defendants are not indebted to the plaintiff upon the bond set forth in the amended complaint as therein alleged; and that said defendants are entitled to judgment against said plaintiff, dis-

missing the complaint in this action, and for their costs to be taxed." These findings were sustained by the circuit judge, and judgment rendered for the defendants accordingly.

Plaintiff appealed from the judgment.

*Jared Thompson, Jr.*, and *J. C. McKenney*, for the appellant, argued, 1. That it was error to confirm the referee's report, because he had not taken the oath of office as required by sec. 28, art. IV of the state constitution. A referee to hear, try and determine the issue, is a judicial *officer*. Tay. Stats., 1499, §§ 25, 26, and 1658, § 48; 7 Bac. Abr., 289; *Bohlman v. Coffin*, 4 Oregon, 313; *Chandler v. Nash*, 5 Mich., 409; *Kennedy v. The State*, 53 Ind., 542; *Hills v. Passage*, 21 Wis., 294. In *Rooker v. Norton*, 1 Pin., 195, it is assumed that referees must be sworn. And the oath is *jurisdictional*. *Courser v. Powers*, 34 Vt., 517; *Bohlman v. Railway Co.*, 40 Wis., 157. It is as indispensable as the order of appointment, as to which see *Stone v. Merrill*, 43 Wis., 72. Judicial authority cannot be conferred by consent. Cooley's Con. Lim., 399; *Hoagland v. Creed*, 81 Ill., 506; *Van Slyke v. Ins. Co.*, 39 Wis., 390. The referee's jurisdiction being limited and special, the facts conferring it must appear upon the record. *Supervisors v. Le Clerc*, 3 Pin., 325. If it was essential to his judicial authority that he should first be sworn, it would have been useless to raise the question before him, as he had no authority to decide it. *Damp v. Town of Dane*, 29 Wis., 419.    2. That the confirmation of the report was erroneous because the referee did not return all the evidence taken by him. Tay. Stats, 1499, § 26, and 1640, § 22; *Yates v. Shepardson*, 27 Wis., 238; *Jenkins v. Esterly*, 22 id., 128; *Gilbank v. Stephenson*, 30 id., 155; *Haney v. Clark*, 1 Pin., 301.    3. That it did not appear from the evidence that the defalcation occurred in the court-house fund.    4. That even if the defalcation was in the fund last named, the general bondsmen were liable: (1) Because the general bond expressly covers all moneys which should come into *Ehlers'* hands as treasurer.    (2) Because sec. 3 of the act of 1871 expressly declares that they shall be liable.    (3) Be-

cause the placing of a special fund in the hands of an officer, or the imposition upon him of official duties, will not furnish a defense to the liability of the sureties. *The People v. Vilas,* 36 N. Y., 459. (4) Because no special bond was required of *Ehlers* by the act of 1871. The special bond actually given, though binding as a voluntary obligation (*Lewis v. Stout,* 22 Wis., 234), did not relieve the sureties on the general bond. 1 Parsons on Con., 36; *United States v. Hodge,* 6 How., 297; *Paine v. Voorhees,* 26 Wis., 522.

For the respondents, briefs were filed by *Jenkins, Elliott & Winkler,* and a supplemental brief by *Samuel Howard,* and there was oral argument by *Mr. Jenkins* and *Mr. Howard.* They argued, 1. That the referee was not an officer, within the meaning of sec. 28, art. IV of the state constitution (*Underwood v. McDuffee,* 15 Mich., 361); that, if any law had required him to take the oath before entering upon his duty, the act of the parties in voluntarily proceeding to trial, without objection, would have been a waiver (*Howard v. Sexton,* 1 Denio, 440; *People v. McGinnis,* 1 Parker, 387, 391; *Thompson v. Smith,* 2 Bond, 320); and that, in the absence of any evidence on the subject, the presumption is in favor of regularity. *Leyde v. Martin,* 16 Minn., 38, 41; *Putnam v. Dutton,* 8 Vt., 396, 399, 400; *Reed v. Talford,* 10 id., 569; *Allen v. Beekman,* 42 Wis., 185, 190. 2. That the objection that the referee had not returned all the evidence, was not well founded in fact, and was not properly taken. 3. That the sureties on the treasurer's general bond were not liable for a defalcation in the " court-house fund." By the weight of authority, an official bond does not cover duties created by law subsequently enacted. *Bartlett v. Attorney General,* Parker, 277; *Bowdage v. Attorney General,* id., 278; *Mayor of Cambridge v. Dennis,* 1 Ell., B. & Ell., 660; *Skillett v. Fletcher,* L. R., 2 C. P., 469; *U. S. v. Kirkpatrick,* 9 Wheat., 720; *Grocers' Bank v. Kingman,* 16 Gray, 473; *People v. Edwards,* 9 Cal., 286; *Brown v. Lattimore,* 17 id., 93; *Van Epps v. Walsh,* 1 Wood, 598. Counsel analyzed the act of 1871, and the subsequent acts on the same subject, and to the

point that the later acts were to be considered in construing the first, they cited *Rogers v. Bradshaw*, 20 Johns., 744; *Bonham's Case*, 8 Rep., 117; *Alexander v. The Mayor*, 5 Cranch, 1; 1 Kent's Com., *463; Potter's Dwarris, 189, and authorities in note 9; id., 145, rule 17; Smith's Com., secs. 639 et seq.; *Munger v. Lenroot*, 32 Wis., 541; *Winslow v. Urquhart*, 39 id., 266; *Bound v. Railway Co.*, unreported. In a case like this, the exaction of a special bond for a special fund excludes the idea of reliance upon a general bond, and shows that the special bond alone is liable for a deficit in the special fund. *Crumpler v. The Governor*, 1 Dev. Law., 52; *The Governor v. Barr*, id., 65; *The Governor v. Matlock*, id., 214; *Waters v. The State*, 1 Gill, 302; *Jones v. Hobson*, 2 Rand., 483; *Comm. v. Toms*, 45 Pa. St., 408; *Comm. v. Hilgert*, 55 id., 36; *Lyman v. Conkey*, 1 Met., 317; *Williams v. Morton*, 38 Me., 52; *State v. Corey*, 16 Ohio St., 17; *People v. Moon*, 3 Scam., 123; *State v. Johnson*, 55 Mo., 80; *State v. Young*, 23 Minn., 551; *Henderson v. Coover*, 4 Nev., 429; *U. S. v. Cheeseman*, 3 Sawyer, 424.

TAYLOR, J.  We are of the opinion that the finding of fact is fully sustained by the evidence in the case.

In the first place, the court might be justified in presuming that the finding of fact was sustained by the evidence, because the appellants have not pointed out wherein the evidence fails to support such finding. It becomes, we think, the duty of the party who takes an exception to a finding of fact, upon an appeal to this court, to point out wherein the evidence fails to establish such fact, and not leave the court to labor through a mass of undigested evidence to ascertain for itself where the defect in the evidence exists. But in this case we are not called upon to proceed upon a presumption, as the counsel for the respondents have taken upon themselves the burden of showing affirmatively that the evidence does sustain the finding. After as careful an examination of the evidence, as digested by the learned counsel for the respondents, as our time will permit us to give to that work, we are satisfied that the

finding is fully sustained. The evidence shows that this court-house fund was kept by the defendant *Ehlers* in the Second Ward Bank, in Milwaukee; that, in addition to said special court-house fund, *Ehlers* had, previous to the 7th day of February, 1874, placed in said bank, of the general funds of said county in his hands, the sum of $91,729.17; and that at that date he had drawn out all the money so deposited belonging to the " court-house fund," and the general fund, and was, in fact, indebted to the bank in the sum of $5,890.68. It also appears that at that date there should have been in the " court-house fund " over $15,000 to his credit. It appears, also, that at that date he had paid out, at said bank, the sum of about $10,517 upon orders drawn upon the general fund of said county, more than had been paid in to the credit of said fund at that date. The evidence also shows that, between the 7th day of February, 1874, and the 2nd day of May following, which was the date when, under the provisions of ch. 178, Laws of 1874, the balance of the court-house fund should have been transferred to the general fund, and when an entry was in fact made in the books of the treasurer giving the general fund credit for the amount of said fund which then remained unexpended and should have been in the hands of *Ehlers*, there had been paid into the Second Ward Bank, to the credit of *Ehlers*, the sum of $63,365.62, including two items of interest amounting to $569.18, of money belonging to the general fund of the county of Milwaukee; and that he had drawn out in the same time for general county purposes, $31,087.75, for court-house purposes, $1,168.68, and for other purposes, not apparently on account of either fund, $6,100. Adding the over-draft of $5,890.68 on the 7th of February, 1874, it left, on said 2nd day of May, to the credit of *Ehlers* in said bank, the sum of $17,118.51. The evidence further shows that previous to the 2nd of May, 1874, *Ehlers* had paid into said bank moneys belonging to the general fund, in all, the sum of $152,525.61; that he had paid out upon orders payable out of such fund, the sum of $133,333.85; and there should have been to the credit of the general fund in said bank on that

day the sum of $19,191.76. There should also have been to his credit the unexpended balance of the court-house fund, $14,070.93. He should have had on hand the sum of $33,-262.69. He had in fact on hand the sum of $17,118.51; his account was short on that day, $16,144.18.. This amount consists of $14,070.93, balance of court-house fund, leaving $2,073.25 as a deficiency in the general fund. The evidence further shows that the sureties on the bond in suit in this action have paid into the general fund $3,200 before this action was commenced; thus making up for the deficiency of $2,073.25 in the general fund, and some $1,127 over.

Although, from this evidence, it appears that on the 7th day of February, 1874, the general fund account had been overdrawn to the amount of over $10,000, this over-draft was made good by payments into the bank of $25,000, money belonging to said fund, two days after, and that account was kept good from that time, and on the 2d of May, 1874, there was a balance to the credit of that fund of $17,118.51, within $2,073.26 of what the actual balance ought to have been, and that sum has been more than paid by the sureties to the bond upon which this action is brought. And there is no evidence that the "court-house fund" was ever made good between the 2d day of May, 1874, and the commencement of this action. It may be urged that on the 7th of February, 1874, when the whole court-house fund was exhausted, and the treasurer was indebted to the bank holding the fund, a part of that fund had been drawn to pay orders on the general fund; and this appears to have been the fact; for, on that day an order of the amount of $50,000 on the general fund was paid, and this order not only exhausted all the general fund, as well as the court-house fund, but left the treasurer indebted $5,890.68, and the general fund overdrawn $10,516. It would seem, therefore, that of this $10,516, $4,625.32, the difference between the overdraft and the $10,516, must have been paid out of the court-house fund; that the money belonging to the general fund afterwards paid into the bank should go to the credit of the court-house fund to the amount drawn from it for gen-

eral purposes; and that the sum of $4,625.32 should be deducted from the sum of $14,070.93, which ought to have been to its credit on that day. Deducting that sum, the actual deficit in that fund, after February 9, 1874, when the payment of the $25,000 of the general funds into the bank was made, would have been only $9,445.61; but it also appears that between that date and May 2d, 1874, there was paid out of the general fund orders drawn on the court-house fund to. the amount of $1,168.68, and this, added to the $9,445.61, will make the actual deficit in that fund, May 2, 1874, $10,614.29, being more than the whole sum claimed as deficient in the treasurer's account at the commencement of this action. It is also claimed that there was a further sum of $1,256.77, of court-house orders paid out of the general funds; so that this view of the case would not change the fact that the court-house fund has been converted by *Ehlers* to a greater amount than he is in default to the county. We think, therefore, the finding of fact above quoted was fully sustained by the evidence; and the only remaining question is, whether, upon such finding of fact, the conclusion of law legitimately follows therefrom.

Had it not been for the expression found in sec. 3, ch. 400, P. & L. Laws of 1871, above quoted, "and the said treasurer and his sureties shall be liable to said county for any misapplication of the same or any part thereof," we should without any hesitation have. come to the same conclusion as was arrived at by the learned counselor who was the referee, as well as by the circuit court. This expression has given us some difficulty; but, taking into consideration the whole act in relation to this fund, and in connection with ch. 178, Laws of 1874, which provides for the conversion of the unexpended balance into general funds, and the like expression in that act, as above also quoted, we are inclined to hold that it was the intention of the legislature not to impose upon the sureties on the general bond of the treasurer any liability for the safe-keeping and disbursement of this special fund. This law of 1871, providing for the raising of funds for the construction of a court house, was

passed after the then treasurer had been elected and qualified; and his general bond had been given without any reference to this fund coming into his hands, and quite likely without any expectation, on the part of his general sureties, that any such fund would come under the control of the then treasurer during the term for which they agreed to be holden as sureties. This act, as amended by the law of 1872, provided for the issue and sale of $200,000 of bonds at once; and in this respect it differed from the act of 1870, which was the first act on this subject. That act provided for the issue of the bonds by installments, as the money was needed for the construction of the court house, the proceeds to come into the hands of the treasurer. of the county, and to be paid out only for the specific purpose of building a court house. As the building of a court house on so extended and costly a plan would necessarily extend through a considerable time, it provided for leaving in the hands and under the control of the treasurer a very large sum of money for an unusually long time; and if the general sureties of the treasurer were to be held for the safe-keeping of this fund, it would very greatly increase their liability upon their bond, beyond what they may well have supposed their liability would be when they signed. It is well known that even the treasurer of the county of Milwaukee, though handling a very large sum of money in the course of his term of office, seldom has in his hands a very large sum for any considerable length of time, as the ordinary demands upon the funds in his hands keep nearly even pace with the receipts. These facts were undoubtedly potent with the legislature as a reason for requiring the treasurer to give a special bond for the safe-keeping and disbursement of this special fund. Whilst we do not desire to be understood as deciding that the legislature might not have made the general sureties liable for the safe-keeping and disbursement of this fund, if it had been so disposed, either by an express declaration that they should be so liable or by merely placing the funds in the custody of the treasurer for safe-keeping and disbursement, without any express direction that they should be so liable, we think the legis-

lature took into consideration the facts and circumstances connected with the matter, and the hardship of imposing such an unanticipated and onerous responsibility upon the general sureties, and intended to relieve them of all responsibility on account of this fund, by requiring the treasurer to give a new and different bond, with other sureties, to protect the county against the misconduct of the treasurer in respect thereto. It was but just that such requirement should have been made; and, as it was made, we must presume it was intended to relieve the general sureties of all responsibility in the matter, unless the acts of the legislature clearly indicate that, notwithstanding the special bond was required, the general bond should also be holden. The action of the supervisors in directing the predecessor in office of *Ehlers* to retain this fund until he had given the special bond required by sec. 3, ch. 400, P. & L. Laws of 1871, is in harmony with the idea that this special bond was the only security the county had for the safe-keeping and proper disbursement of that fund, and that the custody of the fund was placed in the hands of *Ehlers* upon that security alone. The general rule is, that where an officer is required to perform a duty which is special in its nature, and he is required to give a special bond for the faithful performance of such duty, in the absence of any declaration that the general bondsmen shall also be liable, no such liability attaches. Without quoting from or commenting upon the authorities cited by the counsel for the respondents in their brief to support this proposition, we think it is fully sustained by them. *Crumpler v. The Governor*, 1 Dev., 52; *Governor v. Barr*, id., 65; *Gov. v. Matlock*, id., 214; *Waters v. State*, 1 Gill, 302; *Commonwealth v. Toms*, 45 Pa. St., 408; *State of Ohio v. Corey*, 16 Ohio St., 17; *People v. Moon*, 3 Scam., 123; *State v. Johnson*, 55 Mo., 80; *United States v. Cheeseman*, 3 Sawyer (U. S. C. C.), 424; *State v. Young*, 23 Minn., 551; *Henderson v. Coover*, 4 Nev., 429; *Lyman v. Conkey*, 1 Met., 317; *Williams v. Morton*, 38 Me., 52.

The remaining question is, whether ch. 400, P. & L. Laws of 1871, does upon its face, either expressly or by fair impli-

cation, declare that the sureties on the general bond shall be liable for the safe-keeping and disbursement of this special fund. On the part of the appellant, it is claimed that the words injected into sec. 3 above quoted, "and the treasurer and his sureties shall be liable to said county for any misapplication of the same, or any part thereof," clearly indicate that the legislature intended to declare that the sureties on the general bond should also be liable for the safe-keeping and disbursement of such special fund, notwithstanding they, immediately after that sentence, declare that it shall be unlawful for the treasurer to receive any of said bonds or the proceeds thereof, until he shall give a special bond in double the amount of the bonds so received, conditioned for their safe-keeping, and the safe-keeping of the proceeds thereof, separately from all other moneys belonging to the county, and pay them out only upon an order of a prescribed form, differing from other orders upon the funds in his hands, and only for one specific purpose. There is some ground for this argument; and if the construction of this sentence depended solely upon the provisions of ch. 400, it would be entitled to great weight; but as such construction is opposed to every other part of that chapter, and does not harmonize with its other provisions, we feel justified in giving great weight to the subsequent construction given to this provision, if not directly, by a most strong implication, by the legislature itself, in ch. 178, Laws of 1874, by which the legislature, with full knowledge of the provisions of ch. 400, P. & L. Laws of 1871, in providing for the conversion of the balance of this fund into general funds of the county, expressly declares that when such balance is so converted, "the treasurer and his sureties be, and they are hereby made, liable for said money the same as any other money in said fund;" using much stronger and more particular language than was used in ch. 400. It is clear that the legislature which passed ch. 178, Laws of 1874, did not suppose that by virtue of the provisions of sec. 3, ch. 400, P. & L. Laws of 1871, the sureties upon the general bond were liable for the whole or any part of this "court-house fund." If they so understood

it, the declaration made by them in ch. 178 rendered it, to say the least, obscure and doubtful. If they so understood it, the declaration above quoted was not only superfluous, but mischievous. The conversion of the special fund into general funds of the county in the hands of the treasurer would have been very likely to have made the sureties on the treasurer's general bond liable therefor without any special declaration to that effect; and there does not seem to be any reasonable explanation of the added declaration, except upon the theory that the legislature understood such sureties were not then liable for that fund, and the sureties on the special bond were solely liable therefor; and to make that view of the case more clear, they added an express declaration changing the liability for the future safe-keeping of the fund to the sureties in the general bond, and thereby, also, by a strong implication, relieving the sureties upon the special bond from any further liability for the safe-keeping of such balance of the fund.

In construing particular words or phrases in a statute, great weight is always to be given to the construction which the legislature passing the same has put thereon, either in other parts of the same act, or in other acts relating to the same subject matter. *Rogers v. Bradshaw*, 20 Johns., 744; 1 Kent's Com., 463; *Alexander v. The Mayor*, 5 Cranch, 1; *Munger v. Lenroot*, 32 Wis., 541; Potter's Dwarris, 189, and note. We are of the opinion that, in view of all the legislation upon this subject, and from the nature of the duties required of the treasurer as respects this special fund, the words found in sec. 3, ch. 400, P. & L. Laws of 1871, "and the said treasurer and his sureties shall be liable to said county for any misapplication of the same or any part thereof," must be construed to refer to the sureties on the special bond there required to be given, and not to the sureties on his general bond. If the legislature had intended to charge the sureties upon the general bond for the safe-keeping of this special fund, we think it would have so stated in express terms, and not left the matter in doubt.

It is urged by the counsel for the appellants, that under the

provisions of ch. 400, P. & L. Laws of 1871, the defendant Ehlers was not required to give the special bond required by that statute; that its provisions referred to the then treasurer of the county, and not to his successor or successors in office; or that, at most, it required only such bond from such treasurer as had the sale and negotiation of the bonds, and not from the treasurer who received the proceeds of the bonds only. We think this view of the law is unwarranted. The language is general, that the treasurer shall give the bond; and the conditions are, not merely that he will keep the bonds safely, but that he will keep the moneys arising from the sale thereof safely, and disburse the same in the manner and for the purposes prescribed in the act. The whole object of the law seemed to be, to create and keep separately this fund for the construction of the court house, free from all other funds of the county, and to provide that a separate bond should be given to protect the county against any and every misappropriation thereof. It is also clear that it was anticipated that the fund so created would not be disbursed during the term of the then treasurer of the county. As the object of requiring the separate bond was to protect and secure the fund to the county, there was the same propriety in requiring the bond of the successor of the then treasurer, into whose hands nearly $100,000 of the funds came for disbursement, as there was in requiring it of his predecessor, and the same reason for relieving the bondsmen on the general bond from liability therefor. It may be, as it was argued in another case involving this question, that the promoters of this law in the legislature had in view the giving of an additional compensation to the then treasurer for the sale and negotiation of these bonds, and that this was the principal object of the law; but it would be a most unjust imputation to hold that such were the motives which actuated the legislature. The act itself discloses no such intent.

The intention is very clear, that a special fund of a very large amount was to be raised for a special purpose, in a manner out of the usual course of raising funds for the use of

the county; that this fund was for a purpose which would be temporary, though likely to run through more than the term of office of the then treasurer; and as it was a fund which would be needed but once, and would come to the hands of the treasurer of the county but once in the course of many years, it was deemed wise by the legislature that it should be kept entirely separate from all other funds, and that its safe-keeping and disbursement should be secured to the county by a special bond, applicable to this fund alone. So long as the fund was unexpended and the purpose for which it was raised was unaccomplished, we think it was the intention that this special bond should be given by the treasurer holding the same. This view of the case is clearly to be inferred from the act of the legislature in 1874, above quoted, providing for the conversion of the unexpended balance, after the purpose of its creation was accomplished. If the legislature which passed that act did not understand that the then treasurer had been legally required to give the special bond required by ch. 400, P. & L. Laws of 1871, the declaration in that act, that when such surplus came into the general funds of the county, the sureties of the treasurer on his general bond should be liable therefor, the same as for any other funds in his hands, was worse than useless. This act clearly recognized, not only the fact that the then treasurer had given the special bond required by said ch. 400, but that under the provisions thereof he was required to give such bond. And the declaration above referred to was, as is said above, also intended to relieve such special bondsmen from all further liability therefor after the unexpended balance was paid into the general fund.

As the evidence shows that the moneys converted by the defendant *Ehlers* were a part of this special fund, and that the same were converted before the passage of ch. 178, Laws of 1874, which turned such special fund into the general fund, such conversion was not a breach of any of the conditions of the bond upon which this action was brought, and the judgment of the circuit court dismissing the complaint was rightly entered.

In this view of the case there is no necessity of passing upon but two other questions raised by the appellant.

1. It is claimed that the proceedings are irregular for the reason that the referee did not take an oath of office. Without determining whether it is irregular for a referee to hear and try a case without first having taken the oath of office, there are at least two reasons why that objection cannot be raised in this case. First, the record does not show that the referee did not take an oath of office; and secondly, if he did not take such an oath, and the law requires that he should, the appellants waived the right to insist that he should have taken such oath, by proceeding to the trial before him, knowing that he had not taken such oath, and taking no exception on that ground. *Howard v. Sexton*, 1 Denio, 440; *Thompson v. Smith*, 2 Bond (U. S. C. C.), 320.

2. It is claimed that a new trial should be granted because the report of the referee does not contain all the evidence. This exception cannot be heard in this court. If the referee failed to return all the evidence taken on the trial, the plaintiff should have brought that question before the court below, by a motion founded upon affidavits showing the fact, and asking an order from the court requiring him to return all the evidence so taken, and for a stay of proceedings upon the motion to confirm the report of the referee, until such order was complied with.

*By the Court.* — The judgment of the circuit court is affirmed.