61 121
76 450

## HASELTINE and another vs. HEWITT and another.

*September 8 — September 23, 1884.*

MARATHON COUNTY LANDS. *(1) Ch. 22 of 1867 construed: Conveyance to state invalid. (2) Ch. 83 of 1883 held invalid.*

1. Ch. 22, Laws of 1867, authorized the conveyance, by Marathon county to the state, of certain lands, in such distinct lots or parcels " as the said county shall now hold by virtue of tax deeds issued upon sales for delinquent taxes heretofore made." The construction given to that act in *Easley v. Whipple*, 57 Wis. 485, that it did not apply to lands of which the tax deeds held by the county were void upon their face, is adhered to, although it now appears that there were no lands to which the act, so construed, could apply.

2. Ch. 83, Laws of 1883, which attempts to declare the true intent and meaning of the act of 1867, is invalid.

    TAYLOR and CASSODAY, JJ., dissent.

APPEAL from the Circuit Court for *Marathon* County.

Ejectment for certain lands in sections 14, 23, and 24, township 27 North, range 2 East, in Marathon county. The facts sufficiently appear from the opinion of the court and the dissenting opinion by Mr. Justice CASSODAY. The an-

swer alleged, among other things, that the action was commenced February 6, 1882, and was barred because not commenced within the time limited by sec. 4, ch. 22, Laws of 1867.

The circuit court found that at the time of the commencement of the action the plaintiffs were the successors to and owners of the original or government title to the lands in question; that the defendants were the holders of the patent title from the state, and grantees of the title of the state; that the plaintiffs were not the owners of the lands; and that the defendants were the owners thereof and lawfully entitled to possession.

From a judgment dismissing the complaint the plaintiffs appealed.

For the appellants there were briefs by *Charles F. Crosby* and *Moses Hooper*, and oral argument by *Mr. Hooper*.

For the respondents there were briefs by *Ordway & Hoyt*, attorneys, and separate briefs by *L. F. Frisby* and *P. L. Spooner*, of counsel, and the cause was argued orally by *Mr. Ordway*, *Mr. Frisby*, and *Mr. Spooner*. To the point that sec. 4, ch. 22, Laws of 1867, was valid as a statute of limitations, they cited: *Smith v. Cleveland*, 17 Wis. 566-7; *Falkner v. Dorman*, 7 id. 388; *Von Baumbach v. Bade*, 9 id. 559; *Smith v. Packard*, 12 id. 371; *Smith v. Ford*, 48 id. 161; *Plumer v. Supervisors*, 46 id. 163, 179; *Eaton v. Supervisors*, 40 id. 668, 673; *Dean v. Earley*, 15 id. 100; *Lombard v. Antioch College*, 60 id. 459.

[No abstract of the discussion of other points by counsel on either side has been given here, for the reason that it was found to be impossible to do even approximate justice to their briefs in the limited space which could properly be assigned thereto.]

COLE, C. J. The learned counsel for the defendants frankly admit that the decision in *Easley v. Whipple*, 57 Wis. 485,

controls this case, unless the fact which was admitted on the trial, that the county of Marathon, when it made its deed to the state, June 3, 1867, held no tax deeds upon the lands which were valid on their face, takes this case out of that ruling. But, after all the ability and learning which illustrated the discussion, a majority of the court are unable to perceive how that fact can or should change the construction which has been placed upon ch. 22, Laws of 1867. It is suggested, if that construction is adhered to in face of the admitted fact, it then follows that there is no subject to which the act of 1867, and the deed from the county to the state, can be applied. Therefore, it is said, this presents a case of latent ambiguity in the law, where parol evidence or proof of surrounding facts and circumstances is competent to apply the law of 1867 and the deed to the intended subject.

It is elementary law that, in case of wills, extrinsic evidence is received to explain an ambiguity not apparent on the face of the instrument to be construed. The same rule is applied to cases of mercantile paper, contracts, and deeds, with a view to ascertain the intention, though not to vary the contract, of the parties. Broom's Leg. Max. 608, gives many illustrations where such evidence has been received on the ground that when the ambiguity itself is raised by extraneous circumstances, it may be removed in the same manner. But we are at a loss to understand how that rule can be applied in the interpretation of a law which this court has held to be plain and unambiguous. It may be true, when it was shown that Marathon county held no lands by tax deeds *prima facie* good, that it had no lands to convey under the law; in other words, there was no subject to which that statute applied. But what of that? Suppose it had appeared from the evidence that in June, 1867, the county held no lands by tax deeds of any kind, but owned a mass of tax certificates; would it be claimed that these certificates might or could be transferred to the state

in fulfilment of the law, rather than that the act should fail for want of some subject to which it could apply? Very nearly such a position was assumed by one of the learned counsel for the defendants, as we understood his argument, who contended that it was really the intent and object of the law to authorize the clerk of the county to convey certain lands to the state for the specified consideration; — not simply to convey a particular kind of title, but any interest which the county had in the lands, whether held by tax deeds or not.    Other counsel, on the same side, say the words "now holds by virtue of tax deeds," which are used in the act, were an essential part of the description of the lands to be conveyed, and that no lands held under any other than tax deeds (if the county had any other) could be included in the conveyance, nor any lands for which the county might receive tax deeds after the passage of the act.   These positions are not very consistent, but we will not dwell upon that subject.

We suppose we must arrive at the intention of the legislature in this, as in other enactments, from the language employed in the act itself.    The law, in words of clear and precise meaning, authorizes the clerk to convey to the state the designated number of acres; the land to be taken from, etc., in such distinct lots or parcels "as the said county shall now hold by virtue of tax deeds issued upon sales for delinquent taxes heretofore made."    This is clear, plain language, and, as it seems to the majority of the court, leaves no room for construction or interpretation.    Whether the legislature would have authorized and accepted a deed from the county which conveyed a title or interest other than that held by virtue of tax deeds valid on their face, it is idle to inquire. It is sufficient to say that this was the interest or title which the law of 1867 contemplated should be conveyed by the county.    We therefore do not think there is any ambiguity, latent or otherwise, to be removed or explained by extrinsic

facts, and such evidence is quite immaterial. True, it is said the court, in construing an act, looks at the "condition of things"—"recurs to the history of the times when it was passed." But that consideration cannot aid the defendants' case if the act in question is clear and explicit in its terms. There is surely no evidence that the legislature in 1867 knew that all the tax deeds held by Marathon county were void upon their face and worthless to convey title. If the legislature had been cognizant of that fact, it is fair to presume it would not have passed this law.

Equally idle, as it seems to us, is the discussion as to the power of the legislature in 1867 to validate the void tax deeds held by Marathon county. The legislature did not attempt to cure such defects in those deeds. "No such language will be found in the law anywhere. We therefore need not consider the question whether the the legislature would have power thus to validate deeds void on their face and divest the title of the original owner. . . . It would be a perversion of both the spirit and letter of the law to say it was intended to cure or make good a tax deed where the name of the state as grantor was omittted." *Easley v. Whipple*, 57 Wis. 488, 489.

Finding in the record no fact which takes the case out of the ruling in *Easley v. Whipple*, a majority of the court adhere to the decision there made.

While a reference is made on the briefs of counsel to ch. 83, Laws of 1883, no benefit was claimed for defendants under that statute. There could not well be any advantage derived from it, as it is obnoxious to several insuperable objections.

After what has been said, it is hardly necessary to add that the case does not come within the limitation of sec. 4, which is relied on as a bar.

The cause was tried by the court, a jury being waived. The court finds that the plaintiffs, at the commencement of

the suit, were the owners of the original government title of the premises described in the complaint. They are entitled to recover on that title. The judgment of the circuit court must therefore be reversed, and the cause remanded with directions to render judgment for the plaintiffs.

CASSODAY, J. This is an action of ejectment, commenced February 6, 1882. The plaintiffs claim title through mesne conveyances from the United States. The defendants claim title under a patent from the state, issued under the following circumstances:

January 30, 1867, the board of supervisors of Marathon county and their clerk made, and soon after presented to the legislature of the state, then in session, a memorial, from which it appeared, in effect, that the county was indebted to the state for delinquent taxes in the sum of $20,271.34; that the same had been added to the apportionment of taxes against that county for the year 1866; that, instead of collecting such taxes in money, a vast amount of lands had been forfeited to the county for taxes, and that the county then held on tax titles and subject to tax deeds upwards of 150,000 acres, amounting to upwards of $100,000 of delinquent taxes, and that a great portion of said lands had not only been forfeited and deeded to the county for the delinquent taxes for one year, but, in many instances, for several years; that the county was unable to dispose of the lands for the amount for which the same were forfeited; that much of the taxes assessed on personal property had been returned delinquent by reason of the property being removed from the county; that the county was unable to pay the state the amount of such delinquent taxes, and therefore prayed to be discharged therefrom, or, in lieu thereof, that the legislature authorize the state to take enough of such lands on such tax titles, at a nominal price, or for the sum for which they were forfeited for taxes, to discharge such indebtedness.

The matter was referred to a committee of the senate, which reported to the effect that the county contained 163 townships, while its population was only 3,678; that it had been almost impossible to collect taxes in the county by reason of the nonresidence of land-owners, and the poverty of the people, and, in consequence, large amounts of lands had, from year to year, been forfeited to the county; that ch. 132, Laws of 1866, had been enacted to remedy the evil; and recommended the passage of the pending bill (ch. 22, Laws of 1867) for the reasons, among others, that it would be merely to enable the county to pay the state indebtedness in kind,— in the same currency the state had compelled the county to take, with the difference that the state would take the lands at fifty cents per acre, whereas they cost the county about seventy cents per acre, one fourth of which was state taxes. Ch. 132, Laws of 1866, referred to in the report, provided, in effect, that whenever any lot or tract of land had, for five successive years, been sold for taxes and bid in for the county, and remained unredeemed, the title thereof should absolutely vest in the county where such lot or tract of land was situated, and, when so vested, should not be liable to assessment for taxes of any kind or description; and also authorized the county board to sell and convey any and all such lands.

In pursuance of that report, ch. 22, Laws of 1867, was adopted, and was published and went into effect March 6, 1867. The deed from the county to the state, authorized by the act, was duly executed, witnessed, acknowledged, and delivered June 3, 1867, and recorded in the register's office for Marathon county, June 12, 1867. The plaintiffs admitted in the record that up to July 1, 1867, the county of Marathon, in its corporate capacity, held no tax deed of lands in the county except tax deeds omitting the words "as the fact is," or omitting the state as one of the grantors.

By ch. 100, Laws of 1868, the commissioners of school

and university lands were authorized to appoint two "persons to act as appraisers of the lands deeded to the state of Wisconsin by Marathon county, in accordance with the provisions of ch. 22, Laws of 1867;" and that act further provided that, upon the completion of said appraisal, said commissioners should "proceed to sell the said lands at the appraised value." In pursuance of that act the commissioners appointed such appraisers, March 20, 1868. By ch. 42, Laws of 1874, said commissioners were authorized and empowered to convey back to the county such of said lands as had been conveyed to the state through mistake, or want of authority, and of which the county had no title at the time of making said conveyance, and where the tax sales on which such title was based had since been canceled. So the title of the state to these particular lands was expressly recognized by sec. 184 of the Revised Statutes of 1878, which expressly declared that "the term Marathon county lands, as used in this title, embraces all lands held by the state, and conveyed to it pursuant to the provisions of chapter twenty-two of the general laws of 1867."

By ch. 83, Laws of 1883, it was declared that the true intent and meaning of sec. 1, ch. 22, Laws of 1867, was that the clerk of the board of supervisors of Marathon county should be and was thereby authorized to convey to the state the lands referred to in that section as then held by said county by virtue of tax deeds issued upon sales for delinquent taxes, although such tax deeds might not have been in the form prescribed by law; and that such tax deeds and such conveyance by said clerk should be and were thereby declared to have been and to be as effectual to pass the title of said lands to the county, and from the county to the state, as though said deeds had been in the form by law prescribed; and that the lands described in the deed to the state were the lands thereby intended to be purchased and conveyed, and that said ch. 22, Laws of 1867, was meant

and intended to apply to all lands described in said deed to the state.

It appears from the evidence that between March 20, 1868, and September 30, 1882, the state had sold and conveyed to sundry parties (including the lands in suit) all of the 40,540 acres of land, except 4,775 acres, and issued patents therefor. The only question involved is the validity of one of those patents under which the defendants claim title.

It is now claimed, and the majority of the court hold, that all this legislation, the conveyance and transfers from the county to the state under the act of 1867, and the several acts, conveyances, and patents from the state under such legislation, are each and all inoperative and without significance. This is held on the authority of *Easley v. Whipple*, 57 Wis. 485. From the decision made by the majority of the court in that case, my brother TAYLOR and I dissented. With convictions then entertained strengthened by subsequent arguments and reflection, I should still feel bound by that decision while adhered to, and would cheerfully follow it as a duty, if the record in this case was substantially like the record in that. But, to my mind, the facts above stated, not present in *Easley v. Whipple*, clearly distinguish this case from that. The question there involved arose upon a demurrer to the complaint, which alleged, in effect, that the plaintiff therein derived his title to the forty acres of land there sought to be recovered, from the United States; that the defendant therein claimed and derived his title to the forty through and by virtue of a tax deed void on its face by reason of the omission of the name of the state as a grantor to the county, issued October 7, 1866, and recorded October 10, 1866; the conveyance from the county to the state above mentioned; a patent from the state to Scott, May 12, 1880; and a deed from Scott to the defendant, July 1, 1882, and from no other source. The only ground of

demurrer assigned, was that it appeared upon the face of the complaint that the action was not commenced within the time limited by ch. 22, Laws of 1867. That question, as I understand, was not discussed in the opinion of the majority of the court in *Easley v. Whipple*, except in so far as it was incidentally involved in determining and holding, that ch. 22, Laws of 1867, did not, on its face, authorize the conveyance to the state of lands upon which the county held tax deeds void upon their face, but only such as were valid upon their face.

The fact here admitted by the plaintiffs in the record, to wit, that the county, at the time of the passage of that act, had no tax deeds valid upon their face, but only tax deeds void upon their face, either by reason of the omission of the words "as the fact is," or by the omission of the name of the state as one of the grantors, did not appear, and the majority of the court in that case expressly declined to decide the case upon that assumption, but assumed the contrary in these words: "But it is said we must *assume* the legislature had full knowledge when the law was enacted that all tax deeds issued to Marathon county were defective, and that the intent to heal these imperfections must be inferred from the passage of the law. We cannot understand upon what grounds such presumption or inference could be made, for it is wholly unwarranted from anything in *the act itself*. . . . *Non constat* that the legislature knew of any imperfections in such tax deeds, or were legislating with reference to them. On the contrary, *we must assume* that the legislature *only had in view* tax deeds issued to the county which were *prima facie* sufficient to transfer the title. Without refining upon words, it seems to us the county could not be said to 'hold' or possess lands by virtue of a tax deed which was absolutely void on its face. Such an instrument would not convey an estate to be held or possessed. We have no idea that the legislature,

when it passed this law, *had such a tax deed in view.* . . . The law has no application to such a deed." It now appears, from the record before us, that what the majority of the court thus "assumed" did not, as a matter of fact, exist; and what the majority of the court thus refused to "presume" did, as a matter of fact, exist. These things, and others mentioned, clearly distinguish this case from *Easley v. Whipple,* and thus we are, to my mind, relieved of any embarrassment which the decision in that case might otherwise afford.

Must we hold, upon the record before us, that the legislature did not authorize and did not intend to authorize the county to convey to the state any land whatever, under and in pursuance of ch. 22, Laws of 1867, simply because the county, at the time, had no tax deed valid upon its face, but did hold a tax deed void upon its face upon each forty of the whole 40,540 acres mentioned in the act? The county had for years before been the municipal agency of the state to collect the $20,271.34 state taxes mentioned in the act. Its efforts to collect the same had been unsuccessful, so far as realizing the money was concerned, but it had from year to year assessed property, levied and apportioned the taxes upon the property so assessed, advertised and sold real estate, and obtained and held tax certificates and tax deeds amounting, at what the lands were bid in for and interest, to about $100,000. The tax deeds on all the lands so sold were in one or the other of two forms then used in certain portions of the state, one of which omitted the words "as the fact is," and the other omitted the state as one of the grantors, and the deeds of each class were void upon their face by reason of such omissions. The state, as principal, was pressing the county, as agent, to make such collection and payment. The county, pleading the poverty and incapacity of its people, offered to turn over to the state in payment a portion of what it had received and had on hand as

the results of its efforts to collect state and county taxes. The state accepted the offer so made to the extent of authorizing the county to convey to the state 40,540 acres of land, *to be taken from towns* 26 and extending north-until the whole amount should be taken, *in such distinct lots or parcels* as the county should then hold by virtue of tax deeds *issued upon sales for delinquent taxes theretofore made;* and also at the same time *deliver over* to the secretary of state, *for the use and benefit of the state,* all the outstanding *tax certificates* upon and against *each* tract or lot of land described in such tax deeds; and said lands and tax certificates so conveyed and delivered were to be in full payment and satisfaction of the sum of money named.  The county, as one of the parties to that agreement and settlement, did thereupon make that conveyance, and delivered it, and the tax certificates on the lands described in such tax deeds, to, and the same were then accepted by, the state.  Presumably, the tax deeds were delivered with the certificates, as the latter were to be upon the same lands covered by the tax deeds.

Both parties to the contract — the county and the state — seemed to have understood it alike, and apparently carried it out in good faith.  The state afterwards frequently ratified the contract so made by legislation, as appears by the several acts above mentioned.  Some half dozen different state administrations, and as many different sets of commissioners of school and university lands, construed the contract so made the same way, by selling and giving patents for most of the lands, and releasing some where the assessments or sales had been illegal.  It is now claimed that neither the county nor the state understood the meaning of the contract to which they were themselves the parties; that neither the county nor the state knew the contents of the tax deeds, although expressly mentioned in the contract between them; that both the county and the state, or at least the state, had

reference to a different form of tax deed, of which it is now conclusively shown the county held none at the time. It may be true that neither the county nor the state knew, as a matter of law, the legal effect of the language employed in any of the tax deeds. That was a matter for judicial construction. But, as parties to the contract, they must have known, or at least be presumed to have known, the contents of the several tax deeds expressly referred to in their contract; and, knowing such contents, they were presumed to know their legal effect.

The words, " as the said county shall now hold by virtue of tax deeds issued upon sales for delinquent taxes heretofore made," found in the act, were simply descriptive of the lands contracted for, and to distinguish them as being described in tax deeds taken by the county, instead of being those upon which the county simply held tax certificates, as stated in the memorial to the legislature. There is a sense in which the words "now hold by virtue of tax deeds" may refer to tax deeds valid upon their face, and not those void upon their face; but it seems to me they can only be used in that sense when speaking of the constructive possession of unoccupied lands. I cannot believe that those words were used by the legislature in any such technical sense. On the contrary, it seems to me they were speaking of tax deeds as men generally speak of tax deeds; that is, deeds issued upon the sale of lands for taxes. In fact, sec. 1 of ch. 22, Laws of 1867, does not end with the words last quoted, but continues, " tax deeds *issued upon sales for delinquent taxes heretofore* made ; " and the lands upon which such deeds *had been* issued in the townships named were to be taken " without exception."

As observed, the words employed are used merely by way of description, and to distinguish the lands to be conveyed from those upon which the county held tax certificates merely, and also from those upon which the county might

thereafter take tax deeds. Both the legislature and this court have frequently spoken of "tax deeds" in this general popular sense, so as to include tax deeds void upon their face, as well as those valid upon their face. Thus sec. 123, ch. 15, R. S. 1849, provided that any suit not "commenced within three years from the time of recording the *tax deed* of sale" should be forever barred. (Sec. 1188, R. S.). In *Edgerton v. Bird*, 6 Wis. 527, the defendant claimed under a tax deed void upon its face for the same reason as here. It was there in effect contended that, the tax deed being void upon its face, the grantee therein named must have known that it was a nullity, worthless for any purpose,— mere blank paper,— and hence not a tax deed within the meaning of that section. But the present chief justice, speaking for the court, said: "If any force or effect is given to this provision of law, it must, under the facts and circumstances of this case, defeat the action. The defendant has possession under a recorded *tax deed*, and had had possession under such a deed more than three years at the time the suit was brought. The *tax deed* was given in 1841," etc. Page 538. That case was followed in *Sprecher v. Wakeley*, 11 Wis. 432; *Lindsay v. Fay*, 25 Wis. 460.

In *Lindsay v. Fay, supra*, the tax deed was void upon its face for the same reason as here, and it was there contended by counsel that "when the statute forbids the maintenance of an action, unless brought within three years from the 'recording of the tax deed,' it does not mean a void deed. A void deed is as no deed." In answer to the argument, Dixon, C. J., said: "The statute imposing the limitation makes no reference to the form of the deed. It does not say a tax deed *valid upon its face*. For all that appears, it *is in entire harmony with the intention of the legislature* that the deed should be such, *and such only*, as should create a belief in the mind of the purchaser, *a person not skilled in the learning and technicalities* of the law, that he had acquired

a good title — that it should be executed by the officer authorized by law, be signed, sealed, acknowledged, and witnessed, according to the usual form for the conveyance of land, and purport, by apt and proper words on its face, to convey the land, notwithstanding it might be technically insufficient for that purpose." Thus it was settled that the words " *tax deed*," in the three-years limitation clause of the statute, was intended to include, and did include, such deeds, when void upon their face, as well as when valid upon their face. The same has been held with reference to the words " tax deed " as used in secs. 1210*d* and 1210*e*, R. S. With such construction put upon those words as found in the general statutes, there would seem to be no good reason for narrowing their meaning and giving them a more technical significance when embodied in an act of the legislature, which constitutes a part of a contract between the county and the state. On the contrary, there is much reason for giving them the most enlarged meaning.

If it is absurd to speak of a county holding lands " by virtue of tax deeds " void upon their face, when the assessment and all proceedings back of the deeds were confessedly regular and valid, as here, then, it seems to me, it would be equally absurd to speak of the county holding lands " by virtue of tax deeds " valid upon their face when the assessment and all proceedings back of the deeds were irregular and void. Such tax deeds, though valid upon their face, would be mere clouds — mere shadows — which, of themselves merely, would be unable to withstand the first breath of truth. Such tax deeds being merely good *prima facie*, with no valid assessments nor legal proceedings back of them, would give to the holder no equitable right or claim to the land. On the contrary, tax deeds void upon their face, but with the assessments and all proceedings back of the deeds regular and valid, would give the county the equitable right, seasonably exercised, to new and perfect tax deeds. With

this confessed equitable right embodied in the offer of the county to the state, I am unable to perceive why the descriptive words in the act accepting the offer should be rendered wholly insignificant and inoperative, merely because the tax deeds which were the subject of the contract were each defective by reason of the omission of certain technical words. To reach such a conclusion, I should be forced to believe that the legislature making the contract excluded from their view all matters of substance, and all tax deeds and all tax certificates then held by the county, and contracted solely with reference to a prescribed form of tax deed, of which the county then held none. This, to my mind, would do violence to the very terms of the contract.

The memorial to the state, with ch. 22, Laws of 1867, constitute the contract. Sec. 4 of that chapter gave the state authority to hold and dispose of the lands so to be conveyed to it, in the same manner, and upon the same terms and conditions, as swamp and overfl owed lands, at a price named, and then provided that " no such lands shall be disposed of or sold *until the expiration of one year* from the passage of this act, *at which time* the *said conveyance* from said county to the state *shall be conclusive* evidence of an absolute title to said lands *in the state*, unless suit be instituted to invalidate the same within that time." This section purports to bar any and all suits brought to invalidate the conveyance from the county to the state after one year from the passage of the act, and to absolutely vest the title in the state under that conveyance after the year. It is said the act does not declare the tax deeds held by the county valid, and that the act nowhere " by any express words attempts to cure defects in tax deeds." I do not understand it to be the province of statutes of limitation to specifically cure defects in prior proceedings, but to limit the time within which actions may be brought to question and litigate such defects, and fix a period after which no such action shall be

instituted, and hence no such defects questioned or adjudged. Thus the short limitation as to tax deeds does not specifically undertake to cure particular defects or irregularities in prior asssesments, notices of sale, sales, certificates, notice of application for deeds, or insufficiency of affidavits of non-occupancy, but simply makes the tax deeds "conclusive evidence" of the existence and legality of all prior proceedings "up to and including the execution of such deeds." Sec. 1188, R. S. The same is true with secs. 1210*d* and 1210*e*, R. S., in which the words "tax deeds" apply as well to such deeds when void upon their face, as to such deeds when valid upon their face. Prior to the expiration of the time limited, such tax deed is at most only *prima facie* evidence of the regularity of such prior proceedings, or it may be that the tax deed is absolutely void upon its face, and hence evidence of nothing; yet, after the expiration of the time limited, it at once, by virtue of the statute, becomes conclusive evidence of the regularity of all prior proceedings, and of an absolute title in the grantee. The decisions of this court to this effect are too numerous for citation. Such tax deed cures all prior defects by simply converting what was only *prima facie* evidence, or no evidence at all, into absolute and conclusive evidence. So, here, the conveyance from the county to the state, authorized by chapter 22, Laws of 1867, is therein made, after the expiration of one year from the passage of the act, without any suit being brought to invalidate the same, "*conclusive evidence* of an *absolute title* to said lands in the state."

But it is claimed that the act afforded no opportunity for bringing such suit. It seems to me there was no difficulty in bringing a suit to invalidate such deed, not only after, but before it was issued. If it was conceived that such proposed deed would be invalid, then I see no difficulty in bringing an action to restrain the county from issuing such deed, and thereby creating a cloud upon real estate. After the delivery

of such deed, the law then in existence seems to have made ample provision for commencing such action, even if it were necessary to make the state a party. Sec. 1, ch. 92, Laws of 1866. That section was revised and continued by sec. 2638, R. S. In fact, ch. 22, Laws of 1867, contemplated such action. But such action would really have been against the commissioners of the public lands. " Making a state officer a party does not make the state a party, although her law may have prompted his action, and the state may stand behind him as a real party in interest." *United States v. Lee*, 106 U. S. 215, and cases there cited. So it appears that all parties had the year given in sec. 4, ch. 22, Laws of 1867, within which to commence the action therein mentioned.

Of course, the county might have issued new tax deeds in the prescribed form, and no one would have had any right to complain. So it would have been competent for the legislature, at the time of enacting ch. 22, Laws of 1867, to have passed an act changing the form of all tax deeds thereafter to be issued as to lands previously sold, as well as to those thereafter sold, so as to dispense with the words "as the fact is," and the name of the state as one of the grantors. *Lain v. Shepardson*, 18 Wis. 59. So there would seem to be no good reason why the legislature could not have limited the time for bringing actions to invalidate the tax deeds void upon their face, or to shorten the time when so limited, provided a reasonable part of the prescribed term still remained after the enactment. Here the deed to the state was made conclusive evidence of an absolute title in the state after one year from the passage of the act, and the time for commencing any action to invalidate such deed was limited to the year so given. The direct effect of thus making the deed from the county to the state conclusive evidence of an absolute title in the state, and to bar all actions commenced after the year to impeach it, was to cure any and all defects in prior proceedings, including the defects in the form of the

tax deeds issued.   The validity of the act being, for the pur-
poses of this case, conceded by the majority of the court, I
am relieved from considering it, except to show the char-
acter of the deed and the nature of the limitation fixed.   I
will say, however, that to my mind the validity of the act
is clearly sustainable within the decisions of this court cited
by counsel for the respondents.

If the act is constitutional, and the deed to the state valid
and effectual for the purposes indicated, then the deed, being
conclusive evidence, is a perpetual bar, to all suits to invali-
date it not brought within the year.   No suit was com-
menced for that purpose until more than fourteen years had
elapsed.   All parties acquiesced, not only in the validity of
the act and the deed given by the county to the state under
it, but also in its application to the lands covered by the tax
deeds and tax certificates turned over and delivered by the
county to the state.   Vast bodies of lands were, in con-
sequence of the act and the deed given to the state under
it, withdrawn from all taxation for many years.   Numerous
sales have been made, and patents issued by the state upon
the lands so conveyed, and large sums of money have been
received by the state for such patents.   These things have
from time to time been not only recognized, but expressly
sanctioned, by legislative enactment.

A subsequent act on the same subject affords complete
demonstration of the legislative sense of its own language.
*Alexander v. Mayor*, 5 Cranch, 8.   This rule is well estab-
lished and has frequently received the sanction of this and
other courts.   *Munger v. Lenroot*, 32 Wis. 546; *Supervisors
v. Ehlers*, 45 Wis. 295.   In *Munger v. Lenroot, supra*, the
court was called upon to construe ch. 154, Laws of 1862, but
felt controlled by the construction given to ch. 215 of
the Laws of 1860 by the legislature of 1869, in passing
ch. 144, Laws of 1869.   The present chief justice, giving the
opinion of the court in that case, said:   "If I had any seri-

ous doubt upon this point, the history of the legislation upon this subject would remove it." And again: "This legislative exposition of the law of 1860 is entitled to almost controlling force when placing a construction upon a precisely similar statute." Here, instead of construing a similar but different statute being *in pari materia*, the often-repeated legislative constructions were upon one and the same statute. This well-recognized rule seems to preclude all doubt as to what the legislature intended by the words " tax deeds " in the act in question.

But this opinion has already proceeded too far. I have, however, merely sought, without elaboration, to indicate my own convictions in this discharge of a public duty, and thus relieve myself from the responsibility of a decision which will lead, I fear, to serious complications, if not great injustice.

TAYLOR, J. I concur in the conclusions, and the reasons therefor, reached by Justice CASSODAY in his dissenting opinion in this case.

*By the Court.*— The judgment of the circuit court is reversed, and the cause is remanded with directions to render judgment for the plaintiffs.