(72 Misc. Rep. 498.)

TOWN OF WHITESTOWN v. TITLE GUARANTY & SURETY CO.

(Supreme Court, Special Term, Onondaga County. June, 1911.) ·

1. Towns (§ 33*)—Officers—Liabilities on Bonds.
    Where the official bond of a town supervisor was issued by a surety company on the application of the supervisor, in which he agreed to pay annually in advance a premium of $20 during the continuance of the bond, and no time is stated, either in the application or in the bond, for

its expiration, and the supervisor continues to pay the annual premium after his re-election for another term and gives no new bond, the surety company continues liable for the proper discharge of duties by the supervisor after the expiration of his original term.

[Ed. Note.—For other cases, see Towns, Dec. Dig. § 33.*]

2. PRINCIPAL AND SURETY (§ 59*)—SURETY COMPANIES—CONTRACTS—CONSTRUCTION.

Where a corporation organized to make bonds for profit upon a consideration executes a bond, any doubtful language therein must be construed most strongly against the company and in favor of the indemnity which the insured had reasonable grounds to expect.

[Ed. Note.—For other cases, see Principal and Surety, Cent. Dig. §§ 103, 103½; Dec. Dig. § 59.*]

3. TOWNS (§ 33*)—OFFICERS—LIABILITIES ON BONDS.

The liability of a surety company on the official bond of a town supervisor for the discharge of his duties after the expiration of the original term for which he was elected during a subsequent term for which the company received the stipulated annual premiums is not affected by the fact that the renewal receipts were simply executed by an agent whose authority was limited.

[Ed. Note.—For other cases, see Towns, Dec. Dig. § 33.*]

4. TOWNS (§ 33*)—OFFICERS—LIABILITIES ON BONDS.

The surety on the bond of a town supervisor is not liable for the moneys received by him under Highway Law (Consol. Laws 1909, c. 25) § 104, providing that money for highways shall be paid to the supervisor, but requiring him to give an undertaking prior thereto.

[Ed. Note.—For other cases, see Towns, Dec. Dig. § 33.*]

5. TOWNS (§ 33*)—OFFICERS—LIABILITIES ON BONDS.

The surety on the bond of a town supervisor is liable for a portion of the mortgage tax fund entrusted to him under Tax Law (Consol. Laws 1909, c. 60) § 261, though the provisions for a tax on mortgages did not take effect till after the bond was executed.

[Ed. Note.—For other cases, see Towns, Dec. Dig. § 33.*]

6. TOWNS (§ 33*)—OFFICERS—LIABILITIES ON BONDS.

The surety on the bond of a town supervisor is not liable for money raised to purchase hose for fire purposes pursuant to a resolution passed at a meeting of the electors of a highway district in the town under the authority of Town Law (Consol. Laws 1909, c. 62) § 313.

[Ed. Note.—For other cases, see Towns, Dec. Dig. § 33.*]

7. TOWNS (§ 33*)—OFFICERS—LIABILITIES ON BONDS.

The surety on the bond of a town supervisor is liable for money raised to pay for water used in the several districts of the town under Transportation Corporations Law (Consol. Laws 1909, c. 63) § 81, requiring such money to be kept as a separate fund and paid over by the supervisor according to the terms and conditions of any contract for the purchase of water.

[Ed. Note.—For other cases, see Towns, Dec. Dig. § 33.*]

8. TOWNS (§ 33*)—OFFICERS—LIABILITIES ON BONDS.

Under Town Law (Consol. Laws 1909, c. 62) § 263, making the supervisor custodian of moneys raised to pay for contracts for lighting districts of the town, the surety on the supervisor's bond is liable for such moneys.

[Ed. Note.—For other cases, see Towns, Dec. Dig. § 33.*]

Action by the Town of Whitestown against the Title Guaranty & Surety Company on a surety bond conditioned for the faithful per-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

formance of the duties of supervisor of the town. Findings ordered for plaintiff.

G. C. Morehouse, for plaintiff.

G. E. Dennison, for defendant.

ANDREWS, J. In November, 1905, one Bernard L. Wrench was elected supervisor of the town of Whitestown. He duly took his oath of office, and on January 2, 1906, he filed an official bond executed by the defendant. This bond recited that, whereas Bernard L. Wrench was on November 7, 1905, duly elected supervisor of the town, he, as principal, and the defendant, as surety, pursuant to section 60 of the town law (Laws 1890, c. 569, now section 100 of Consol. Laws 1909, c. 62), jointly and severally undertook that he would faithfully discharge his official duties as such supervisor, and account for all moneys and property belonging to the town and coming into his hands as such supervisor.

This bond was issued by the defendant upon an application made by Wrench, which is put in evidence. Reference to this application shows that the bond is to date from January 1, 1906; that the term of office of Wrench is two years; that the bond is to be filed annually; and that Wrench's account is examined on the 28th of each December. In this application Wrench agreed to pay a premium of $20 per annum in advance, during the continuance of the bond, and to file with the defendant certificates of each and every examination which shall be made of his office. There is no time stated in either the application or the bond for its expiration. The defendant is an insurance corporation, giving such bonds as the present for compensation. On February 5, 1907, the defendant received $20 and gave a receipt for "second year premium on bond No. 02557" (being the bond in question). Wrench's term of office expired at the end of 1907, and in November he was re-elected. He again filed his oath, but gave no additional bond. Instead, on January 20, 1908, he again paid to the defendant $20 and received a receipt for third-year premium on the same bond. Precisely the same thing as to the premium and receipt happened in February, 1909.

These various receipts were filed with the town board. At the end of his first term of office, on December 31, 1907, Wrench had in his hands belonging to the town the sum of $1,464.95 for which he has never accounted. Wrench resigned on September 21, 1909, before the expiration of his second term; and at that time the moneys of his town in his hands had increased from $1,464.95 to $12,989.51. He has failed to pay this sum over to his successor in office, although the same has been duly demanded of him.

[1] The first question to be decided is whether the defendant is liable upon the original bond given by Wrench for defaults occurring after December 31, 1907. I think it is so liable. The language of the bond, taken in connection with the application and the premium receipts, imports that the bond is to run indefinitely, one year at a time, during the continuance of Wrench as supervisor of the town of Whitestown, providing payment of the annual premium is made.

[2] In a contract of this kind, executed upon a consideration by a corporation organized to make such bonds for profit, the rule of construction applied to ordinary sureties is not applicable. The bond is in the terms prescribed by the surety, and any doubtful language should be construed most strongly against the surety and in favor of the indemnity which the insured had reasonable grounds to expect. Corporations entering into contracts of this character may call themselves guaranty or surety companies, but their business is in all essential particulars that of insurers who, upon a careful calculation of the risks of such business and with such restrictions of their liability as may seem to them sufficient, undertake to assure persons against loss in return for premiums sufficiently high to make such business commercially profitable. Their contracts are in fact policies of insurance, and should be so construed; and the rule applicable to contracts of fire and life insurance is the rule by analogy most applicable to a contract like that in this case. Cooley, Briefs Ins. 635; Guarantee Co. of North America v. Bank, 80 Fed. 766, 26 C. C. A. 146.

The whole transaction clearly shows that it was the intention and understanding of the parties that the bond might be renewed so as to cover Wrench's actions as supervisor upon the payment of the premium and the giving of the receipt as a fire insurance policy is renewed by a like transaction. The defendant had been informed in the original application, dated in December, 1905, that Wrench's original term of office expired in two years dating from January 1, 1906. And yet, in January, 1908, and in February, 1909, it received and receipted for the third and fourth year premiums on this bond. The purpose of the payment of these premiums and the reason of their acceptance by the defendant are plain. When these payments were made with the assent and approval of the officers of the plaintiff—when these receipts were filed with them—it relied, as it had a right to rely, upon the transaction as a continuance of the original bond. It believed, as it had a right to believe, that such bond constituted a security to it for the moneys received by Wrench as supervisor during the year which the renewal covered. Doubtless a new bond should have been required at the commencement of Wrench's second term. Doubtless it should have been properly executed and acknowledged by the surety and properly approved by the town board. But—

"The failure to execute an official undertaking in the form or by the number of sureties required by or in pursuance of law, or of a surety thereto to make an affidavit required by or in pursuance of law, or in the form so required. or the omission from such an undertaking of the approval required by or in pursuance of law, shall not affect the liability of the sureties therein." Public Officers Law (Consol. Laws 1909, c. 47) § 11.

[3] It is true that the renewal receipts are simply executed by an agent of the defendant whose authority was limited. Such agent could not have executed the original bond. But the company concededly received the annual premiums in question and has retained them. It cannot now be heard to question the agent's authority to deliver the receipts in consideration therefor, nor can it complain that such a transaction entailed consequences which it did not contemplate.

[4] Of the total defalcation of $12,989.51 it is conceded that $4,-685.50 was money belonging to the highway fund; $421.46, money belonging to the mortgage tax fund; $1,100.66, money belonging to the water funds of the water districts of the town; and $2,995.64, money belonging to the lighting funds of the several lighting districts. It is urged by the defendant that, in any event, the moneys belonging to these several funds are not covered by the bond executed by it. It will be necessary to examine the facts in regard to each fund separately.

First, as to the highway fund. It is conceded that the town of Whitestown repaired its highways under what is known as the "money system." It annually raised a tax, levied and collected as other town taxes, for that purpose. The amount of such tax was determined by the commissioners of highways and the town board who certified the same to the board of supervisors. The clerk of this board each year transmitted to the State Comptroller a certificate stating the amount of such tax. Thereupon the Comptroller drew his warrant upon the State Treasurer in favor of the treasurer of the county for an amount equal to 50 per cent. of the amount levied upon the town. This sum the county treasurer then paid to the supervisor of the town to be used for the repair and improvement of the highways therein. Likewise there were paid to the supervisor the proceeds of the tax itself. Section 53 of chapter 478 of the Laws of 1904 provides that he shall be the custodian of such moneys and accountable therefor. It further enacts that:

"Before receiving any such moneys the supervisor shall give an undertaking to the town in an amount and with such sureties as shall be approved by the town board, conditioned for the faithful disbursement, safe-keeping and accounting of the moneys that may come into his hands under this section. Such undertaking shall be filed in the office of the town clerk. The moneys collected and received under this section shall be paid out by the supervisor upon the order of the highway commissioners for the repair and permanent improvement of the highways of the town, in such manner as the commissioner of highways and the town board may determine and direct."

This act was amended by chapter 716 of the Laws of 1907, which went into effect on July 24th of that year. So far as material, the amendment provided:

"Such undertakings shall be filed in the office of the town clerk and a certified copy thereof shall be filed in the office of the county treasurer before any moneys shall be paid to the supervisor."

This section as amended remained in force until January 1, 1909, when the present highway law (Consol. Laws 1909, c. 25) took effect, and section 53 in part became section 104 of the new law. As it now stands, this section provides that:

"All moneys levied and collected, as provided in this article, all moneys collected as penalties under this chapter, or received from any other source and available for highway, bridge and miscellaneous purposes and all moneys received from the state, as provided in section one hundred and one, shall be paid to the supervisor, who shall be the custodian thereof, and accountable therefor. Before receiving any such moneys the supervisor shall give an undertaking to the town in an amount to be specified by the commission and

with such sureties, as shall be approved by the town board, conditioned for the faithful disbursement, sake-keeping and accounting of the moneys so received by him. Such undertaking shall be filed in the office of the town clerk and a certified copy thereof shall be filed in the office of the county treasurer before any moneys received from the state shall be paid to him, and also in the office of the commission. In case of a failure of the supervisor to faithfully disburse, safely keep or account for moneys received from the state the commission may bring an action on such bond in the name of the town."

It was admitted on the trial that the bond required by the highway law was never given by Wrench, and that he received these various sums without complying with the provisions of the statute in this regard.

In my opinion the defendant is not liable for this $4,685.50. Where an officer charged with the performance of general duties in respect of which he gives a general bond has additional duties imposed upon him and the Legislature requires him to give a special bond for the performance of these additional duties, the special supersedes the general bond so far as these duties are concerned; and the sureties upon the general bond will not be held liable for defaults covered by the special bond. Commonwealth v. Toms, 45 Pa. 408; Board v. Ehlers, 45 Wis. 281; Board v. Tower, 28 Minn. 45, 8 N. W. 907; State v. Young, 23 Minn. 559; State v. Starnes, 5 Lea (Tenn.) 545; State v. Johnson, 55 Mo. 80; State v. Bradshaw, 32 N. C. 229; Governor v. Matlock, 12 N. C. 214; Henderson v. Coover, 4 Nev. 429; Broad v. City of Paris, 66 Tex. 119, 18 S. W. 342. Nor does the fact that the special bond has not in fact been given extend the liability of the general sureties. Columbia County v. Massie, 31 Or. 292, 48 Pac. 694; State v. Bateman, 102 N. C. 52, 8 S. E. 882, 11 Am. St. Rep. 708; Morrow v. Wood, 56 Ala. 1.

In many of the cases cited the new duties were imposed upon the officer after the execution of the general bond. But this fact does not invalidate the reasons upon which the decision rests. By requiring the additional bond, whether before or after the execution of the general bond, the Legislature clearly indicates its purpose to confine a recovery to those who have given the special bond for the special purpose.

[5] The next question arises with regard to the $421.46 belonging to the mortgage tax fund. A tax has been imposed upon mortgages in this state since July 1, 1906. A portion of this tax is distributed among the counties under the provisions of section 261 of the tax law (Consol. Laws 1909, c. 60), and the board of supervisors are directed to see that the same is still further distributed among the towns, cities, and villages in the proportion therein provided. The portion that comes to a town, after deducting the share belonging to any incorporated village, is divided as follows: One-half to the payment of school taxes and one-half to the payment of state, county, city, and town expenses. A warrant is then issued for the payment to the town supervisor of the amount payable to his town. The supervisor apportions the sum paid in for school purposes between the several school districts, and that amount is deducted from the next

annual school levy of the school district, and is paid by the supervisor to the collector of such district.

It is true that this act did not go into effect until after the bond in question had been executed by the defendant, and that it placed new duties upon the supervisor. But the new duties were germane and appropriate to the office which he already held, and a surety upon an official bond must be supposed to have contracted with reference to the possibility that such new duties may from time to time be imposed upon the principal.

Nor, as in the case of the highway fund, did the tax law require the supervisor to execute a special bond as guardian of the moneys to be received by him, and no such bond is anywhere required. Section 283 of the education law (Consol. Laws 1909, c. 16) does provide that the county treasurer shall require a person elected or appointed to fill the office of supervisor to give a bond as therein provided, conditioned that he shall disburse, keep, and account for the moneys referred to in article 11 of the education law, and all other school moneys that may come into his hands from any source. Such a bond was given by Wrench. But these mortgage tax moneys were clearly not school moneys within the meaning of this section. My conclusion is, therefore, that such bond given to the county treasurer does not cover this $421.46, and that the defendant is liable therefor.

[6] The third item in dispute is $1,100.66 belonging to the water funds of districts No. 1 and No. 2. Included in this sum, however, was $1,045 raised and levied upon water district No. 1 for the purchase of hose. While the stipulation is not clear upon the point, the understanding seems to be that this hose was purchased for fire purposes under the authority of section 313 of the town law; that the purchase was authorized at a meeting of the electors of district No. 1 duly called by the town clerk; and that the contract for its purchase was made by the commissioners of highways with the approval of the town board. If so, the hose was the property of that district— not of the town. It further seems to be understood that this $1,045 was assessed and levied upon property of the district, that it was collected, and that it was in some way paid over to Wrench, the supervisor. I cannot find that the collector had any authority for such payment. Section 314 of the town law provides that the purchase price of fire apparatus shall be assessed and levied upon the property of said district and collected in the same manner as other town charges are assessed, levied, and collected. Section 59 of the tax law provides that the warrant shall direct the collector of a town to pay over the moneys collected by him as follows: First, to the commissioners of highways of the town, such sum as shall have been raised for the support of highways and bridges therein; second, to the overseers of the poor of the town, such sum as shall have been levied, to be expended by such overseers for the support of the poor therein; third, to the supervisor of the town, all the moneys levied therein, to defray any other town expenses or charges; fourth, to the treasurer of the county, the residue of the money so to be collected; and, fifth, if the

law shall direct the taxes levied for any locality for special purpose to be paid to any person or officer other than those named in this section, the warrant shall be varied so as to conform to such direction.

Clearly the money raised for the purchase of this hose was not levied to defray any town charge or expense. It should have been paid, therefore, either to the treasurer of the county or to the commissioners of highways, the parties who entered into the contract. Wrench was a mere volunteer. He was not entitled to receive it as supervisor or otherwise, and the bondsman is not liable for his defalcation under such conditions. People v. Pennock, 60 N. Y. 421.

[7] The balance of the sum of $1,100.66 consisted of money raised under section 81 of the transportation corporations law (Consol. Laws 1909, c. 63) to pay for water used in the several districts. Such money the statute directs shall be kept as a separate fund and paid over by the supervisor of the town according to the terms and conditions of any contract for the purchase of water. That being so, he was authorized to receive these funds by statute, and he did receive them in his official capacity.

[8] The fourth and last item consists of $2,995.64, funds of lighting districts Nos. 1 and 2. They had been raised to pay for contracts for lighting these districts. Section 263 of the town law provides that funds to pay for such contracts shall be assessed, levied, and collected upon the taxable property in said town or district in the same manner, at the same time, and by the same officers as the town taxes, charges, or expenses of said town are now assessed, levied, and collected, and the same shall be paid over by the supervisor to the corporation, company, person, or persons furnishing or supplying said light. The supervisor is therefore made the custodian of this fund also as in the case of the water funds. He receives the sums so raised in his official capacity, and his bondsmen are responsible for his misuse of the same. In Dunn v. Town of Whitestown (C. C.) 185 Fed. 585, Judge Ray discusses the relations of the town and the supervisor to such funds very ably and fully.

Findings in accordance with these views may be prepared, and, if not agreed upon, may be settled upon due notice.

Ordered accordingly.