**HOME TITLE INS. CO. v. UNITED STATES.**

**No. 225.**

Circuit Court of Appeals, Second Circuit.

June 1, 1931.

108

For the opinion below, see (D. C.) 41 F. (2d) 793.

Weill, Wolff & Satterlee, of New York City (Hugh Satterlee and I. Herman Sher, both of New York City, of counsel), for appellant.

Howard W. Ameli, U. S. Atty., and Herbert H. Kellogg, Asst. U. S. Atty., both of Brooklyn, N. Y. (C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and E. H. Horton, Bureau of Internal Revenue, both of Washington, D. C., of counsel), for the United States.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

SWAN, Circuit Judge.

This is a suit brought in the District Court pursuant to section 24 of the Judicial Code, 28 USCA § 41 (20), for the recovery of capital stock taxes. The taxes in litigation were legally collected if the plaintiff was taxable under section 1000 of the Revenue Act of 1921 (42 Stat. 294) in respect to the taxable years 1923 and 1924, and under section 700 of the Revenue Act of 1924 (43 Stat. 325 [26 USCA § 223 note]) in respect to the taxable year 1925, but were illegally collected if the plaintiff was an "insurance company subject to the tax imposed by section 246" of said Revenue Acts (42 Stat. 262; 43 Stat. 290). The court below ruled that it was not an "insurance company" within the meaning of the section last mentioned. The correctness of that ruling is presented by this appeal.

The plaintiff was incorporated in 1906 under article 5 of the Insurance Law of the state of New York pertaining to title and credit guaranty corporations. New York Laws 1892, c. 690. It is subject to, and has complied with, the regulations of the insurance department of the state, and has regularly filed the annual reports required by law to be filed with the state superintendent of insurance. Its business consists in the insurance of title to real estate and the guaranteeing of real estate mortgages. Because of the government's contention, which prevailed below, that the plaintiff is not "an insurance company," it is necessary to state in some detail how its business is conducted.

Plaintiff's practice with respect to title insurance is as follows: Upon receiving an application for title insurance, plaintiff searches the record title of the real estate in question, and, if the title is found satisfactory, issues its "Policy of Title Insurance" in a stated amount against loss due to defect in title. As consideration therefor, it receives payment of its charges for the examination of title; such charges being in accordance with a fixed scale of rates based on the amount of the policy. If the title is disapproved, no policy is issued, but plaintiff collects from the applicant its charges for the examination of title at the same rate as if the policy had been issued in the amount applied for.

Plaintiff's practice in connection with guaranteeing mortgages involves the making of loans by it secured by mortgage on real estate. Upon receipt of an application for a mortgage loan, plaintiff not only searches the title, but makes an inspection and appraisal of the property in question. If the title and the value of the security are found satisfactory, plaintiff prepares a bond and mortgage to be executed by the applicant, and, after recordation of the mortgage, pays the applicant the face amount of the bond less its charges for title examination, appraisal, etc. Thereafter the bond and mortgage are sold by plaintiff, principally to savings banks and insurance companies which apply to it for guaranteed loans, for the face value thereof, accompanied by plaintiff's "policy" of guaranty, the purchaser agreeing that the plaintiff shall collect the interest and principal of the bond and mortgage and shall retain as compensation all interest collected in excess of the rate guaranteed, which is usually one-half of one per cent. less than the interest rate expressed in the bond. This excess of interest collected by the plaintiff constitutes the consideration or "premium" for its "policy." By the terms of its policy plaintiff "guarantees" to the purchaser, and to subsequent owners of the bond and mortgage, payment at the guaranteed rate of the interest when due under the terms of the bond and mortgage; payment of the principal thereof when collected, and in any event within twelve months after the same becomes due; that the mortgage is a valid first lien upon a marketable title in fee to the premises described; to enforce

prompt payment of fire insurance premiums, taxes, and water rates; and to conduct "without expense to the insured" any litigation involving the bond and mortgage or plaintiff's guaranty. By accepting the policy the insured appoints plaintiff his agent to collect the interest and principal, and agrees to facilitate any litigation plaintiff may engage in respecting the bond and mortgage, to assign the same to plaintiff upon receiving from it payment in full after maturity, and to allow plaintiff to retain from the interest collected its aforesaid "premium." Sometimes, instead of disposing of the bond and mortgage in its entirety, plaintiff sells participations therein and issues what it calls "guaranteed first mortgage certificates." Such a certificate combines an assignment of an undivided part interest in a specified bond and mortgage with a guaranty similar in terms to the regular guaranty policy as to payment of interest and principal of the mortgage, which plaintiff "certifies" is a valid first lien upon the property therein described. Substantially all mortgage loans are disposed of soon after plaintiff acquires them; the average period during which it holds a mortgage before selling it not exceeding two months. The primary purpose of plaintiff in making loans on bonds and mortgages has not been for investment, but for sale guaranteed as aforesaid.

During the taxable years here in question all plaintiff's capital, surplus, and undivided profits were employed indiscriminately in its business activities, and no segregation was made on its books of account of its expenses as between that portion of its business described as insurance of titles and that portion described as guaranteeing mortgages. Without attempting to determine exactly how much of plaintiff's income should be allocated to insurance of titles and how much to guaranteeing of mortgages (the parties not being in agreement), it will suffice to state that a very substantial part of its income is derived from the latter phase of its business.

Under the law of the state of New York, corporations organized under the Banking Laws of the state (Consol. Laws N. Y. c. 2) and subject to supervision of the banking department are authorized to make mortgage loans and sell the same with their guaranty, and the record discloses that during the years in question two such corporations were regularly engaged in substantially the same manner as was the plaintiff in selling to the investing public mortgages and participations in mortgages guaranteed by them, except that they did not guarantee title to the mortgaged premises.

■ If plaintiff's business consisted solely in the insurance of titles, the government would apparently concede that it was an insurance company subject to tax under section 246. See Sol. Mem. 5501, V–1 C. B. 102; G. C. M. 5355 VII–2 C. B. 160. But it is contended that the guaranteeing of mortgages is not insurance, and the court below so held. The argument runs that a guaranty, i. e., the promise to pay the debt of another, cannot be insurance, because it is not a contract of indemnity. Speaking generally, it may be said that a contract of insurance is a contract of indemnity, and many authorities might be cited containing statements to this effect. See United States v. Supplee-Biddle Hardware Co., 265 U. S. 189, 195, 44 S. Ct. 546, 68 L. Ed. 970; Claflin v. U. S. Credit System Co., 165 Mass. 501, 502, 43 N. E. 293; 52 Am. St. Rep. 528; Glendale Woolen Co. v. Protection Ins. Co., 21 Conn. 19, 31, 54 Am. Dec. 309. The statement is true if it means that the insured must have some interest at risk, for otherwise the contract is a wager; but it is not true if construed to mean that the insured can never collect from the insurer more than his actual loss (Empire Development Co. v. Title Guarantee & Trust Co., 225 N. Y. 53, 58, 121 N. E. 468), or that the insured must first salvage what he can and then look to the insurer only for the difference. As is well known, it is the common practice of fire and marine insurers to pay in full and take over the physical remnants of the insured property in the event of injury sufficient to constitute a "total loss." They do not indemnify the insured in the sense required by the defendant's argument; rather they pay upon the happening of the condition specified in the policy, and themselves work out the salvage. Similarly, a policy of credit insurance would surely be no less insurance because the contract provided that upon the debtor's default the insurer would pay in full and take over the claim for collection. See Dane v. Mortgage Ins. Co., [1894] 1 Q. B. 54; Shaw v. Royce, [1911] 1 Ch. 138. This is in substance what the plaintiff agrees to do in its policies of mortgage guaranty. If the mortgagor pays, the plaintiff will remit as soon as collected, reserving its "premium" from the interest, but in any event it will pay on the date specified in its "policy." It bears the risk of noncollection from the mortgagor.

■ It may be important at times to distinguish between contracts of "guaranty,"

"suretyship," or "indemnity," where the rights of the parties to the contract are involved. But where, as here, the question is whether a company engaged in the business of issuing such contracts in large numbers is doing a business of insurance, the answer is not to be found in technical differences of surety and guarantor. There is no hard and fast line between contracts of insurance and contracts of guaranty. Frost, Law of Guaranty Insurance (2d Ed.) 16; Hunt v. New Hampshire Fire Underwriters' Ass'n, 68 N. H. 305, 308, 38 A. 145, 38 L. R. A. 514, 73 Am. St. Rep. 602. Insurance differs from guaranty only as the business of insurance differs from a single contract of guaranty, suretyship, or indemnity. The business of insurance consists in accepting a number of risks, some of which will involve losses, and of spreading such losses over all the risks so as to enable the insurer to accept each risk at a slight fraction of the possible liability upon it. As this court said in Tebbets v. Mercantile Credit Guarantee Co., 73 F. 95, at page 97, in respect to credit insurance: "Corporations entering into contracts like the one at bar may call themselves 'guarantee' or 'surety' companies, but their business is in all essential particulars that of insurers, who, upon careful calculation of the risks of such business, and with such restrictions of their liability as may seem to them sufficient to make it safe, undertake to assure persons against loss, in return for premiums sufficiently high to make such business commercially profitable. Their contracts are, in fact, policies of insurance, and should be treated as such."

Guaranteeing the payment of mortgages bears a close analogy to credit insurance, and to fidelity insurance as practiced by corporate sureties for profit. See Town of Whitestown v. Title Guaranty & Surety Co., 72 Misc. Rep. 498, 131 N. Y. S. 390, affirmed 209 N. Y. 512, 102 N. E. 1115; State v. Chicago Bonding & Surety Co., 279 Mo. 535, 215 S. W. 20; Young v. Am. Bonding Co., 228 Pa. 373, 77 A. 623; Philadelphia Casualty Co. v. Fechheimer, 220 F. 401, 417, Ann. Cas. 1917D, 64 (C. C. A. 6). If the sole service rendered by a corporation consisted in guaranteeing the payment of mortgages upon application by the mortgagees, it would seem to us perfectly clear that the business was truly "insurance." See People v. Potts, 264 Ill. 522, 528, 106 N. E. 524.

What raises doubt in the case at bar is the fact that, although true insurance is involved, the service rendered by plaintiff is not the guaranteeing of mortgages already owned by the applicants for such guaranty, but may be argued to be the procuring for the investing public of sound investments, which incidentally include plaintiff's guaranty. Which is the dominant and which the incidental feature of the business? In the case of one who trades in mortgages, the profit in the transaction is expected to come from the spread in purchase and sale prices. This is not true of plaintiff's business. Its primary purpose in acquiring and disposing of mortgages is not to invest its funds or to sell the mortgages at a profit, but is to dispose of them at their face value accompanied by its guaranty; and it is from the "premium" for such guaranty, together with the fees previously collected from the mortgagor upon the making of the bond and mortgage, that plaintiff's profit is derived. Such fees cover charges for searching the title, and for inspecting and appraising the property, etc. The fees for title examination may be considered as the premium for the guaranty of title contained in the policy that is subsequently to be issued upon plaintiff's disposal of the bond and mortgage. This is none the less title insurance because the word "guarantee" rather than "insure" is used. See Title Ins. & Trust Co. v. City of Los Angeles, 61 Cal. App. 232, 214 P. 667. Nor does it matter that the insurance is paid for by one who is not the insured. The fees for inspections, appraisals, etc., may be considered as an incident to the insurance of the mortgage, for it is not an unreasonable incident to the business of guaranteeing mortgages that the insurer should investigate and appraise the property it is to insure. Despite the mounting size of such fees, we think they remain an incident to the guaranty of the mortgage, unless that guaranty itself is to be deemed but incidental to a business of investing in and selling mortgages. In determining which way the business should be viewed, the case of United States v. Cambridge Loan & Bldg. Co., 278 U. S. 55, 49 S. Ct. 39, 73 L. Ed. 180, becomes apposite. There a corporation which by the state law was a building and loan association had power to receive deposits from and make loans to persons who were not members, and the federal tax officials contended that the exercise of such powers made it in substance a banking institution rather than a "building and loan association" within the exemption from income tax granted by section 231 of the Revenue Acts of 1918 and 1921 (40 Stat. 1076, 42 Stat. 253). But the argument was

rejected on the ground that in exempting such associations Congress was speaking of existing societies that commonly were known as such, so that the term included what the states were content to recognize as building and loan associations, unless there was a gross misuse of the name. In the case at bar the state has classified the business done by plaintiff as insurance, though not with absolute consistency, since banking corporations may also sell mortgages with their guaranty. Nevertheless, it has accepted plaintiff as an insurance company and subjects it to supervision by the department of insurance. The departure from insurance is surely no greater than was the departure from the normal business of loan associations in the Cambridge Case. This recognition by the state of the nature of plaintiff's business should turn the scales, if the question hangs in doubt. In our opinion the plaintiff should be deemed an "insurance company" subject to tax under section 246.

■ There is advanced a further argument against this conclusion based upon the contention that what Congress regarded as an insurance company is indicated by its definition of "gross income" set forth in section 246 and by the deductions therefrom permitted by section 247. It is argued that gross income is to be "computed on the basis of the underwriting and investment exhibit of the annual statement approved by the National Convention of Insurance Commissioners," and that, since no form for an "annual statement" for title and mortgage guaranty companies was approved by the National Convention until long after the taxable years in question, Congress cannot have intended to include such corporations within the section. This argument, however, proves too much; for it would exclude companies engaged solely in insuring titles, although such companies are concededly taxable under section 246. See Sol. Mem. 5501 V–1 C. B. 102; G. C. M. 5355 VII–2 C. B. 160. Although section 246 (b) (1) refers to the form of annual statement approved by the National Convention of Insurance Commissioners, other subdivisions of the section proceed to specify how gross and net income are to be computed, so that the absence of such an approved form of annual statement would seem unimportant. See Massachusetts Protective Ass'n v. Commissioner, 18 B. T. A.

810; Western Casualty Co. v. Commissioner, 20 B. T. A. 738. Moreover, the National Convention has approved forms for "miscellaneous insurance companies," and it is by no means clear that title and mortgage guaranty companies could not fall, within this classification. It is said further that not all of plaintiff's income can be classified as "investment income" or "underwriting income" as defined in said section 246, so that our conclusion will result in a large part of its income escaping taxation. This argument rests chiefly upon the premise that the income derived from guaranteeing mortgages cannot be deemed "underwriting income" and in the view we take this premise is false. Even if the incidental fees collected for inspections, appraisals, etc., would escape taxation (as to which we express no opinion), it does not follow that plaintiff is not an insurance company within the meaning of section 246. It was not until 1928 that Congress added to the computation of income of insurance companies, other than life or mutual, gain derived from the sale of property (45 Stat. 844, § 204 (b) 1, 26 USCA § 2204), yet it could scarcely be maintained that prior to 1928 such companies, if they had any income of this type, were to be excluded from taxation as insurance companies. Cf. John Hancock Mut. Life Ins. Co. v. Commissioner, 10 B. T. A. 736; Independent Life Ins. Co. v. Commissioner, 17 B. T. A. 757; Massachusetts Protective Ass'n v. Commissioner, 18 B. T. A. 810.

The question presented by this appeal appears to have been presented to the courts in but three other cases. In Lawyers' Mortgage Co. v. Bowers, 34 F.(2d) 504, which we have this day affirmed, 50 F.(2d) 104, the District Court decided in favor of the taxpayer. In Louisville Title Co. v. Lucas, 27 F.(2d) 413 (D. C. W. D. Ky.), and Title Guarantee & Trust Co. v. United States (D. C. S. D. Cal.) 49 F.(2d) 641, decided April 29, 1931, the government prevailed. The latter of these two cases may be distinguished upon its facts, but the former must probably be admitted to be inconsistent with the conclusion we have reached. It should be noted, however, that it was decided prior to the Supreme Court's opinion in United States v. Cambridge Loan & Bldg. Co., supra.

Judgment reversed.