**LAWYERS' MORTG. CO. v. BOWERS, Collector of Internal Revenue.**

**No. 16.**

Circuit Court of Appeals, Second Circuit.

June 1, 1931.

CHASE, Circuit Judge, dissenting.

For opinion below, see (D. C.) 34 F.(2d) 504.

Robert E. Manley, Acting U. S. Atty., of New York City (Samuel C. Coleman and Frank Chambers, Asst. U. S. Attys., both of New York City, of counsel), for appellant.

Shearman & Sterling, of New York City (Harry W. Forbes, of New York City, of counsel), for appellee.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

SWAN, Circuit Judge.

After this appeal was taken, the defendant died. Upon the argument this fact was suggested, and his executor, appearing by attorney and so requesting, was admitted as a party to the suit pursuant to Rule 17 of this court. Some question was raised by the appellee, though the point was not pressed, whether the appeal ought to be continued by the defendant's executor or by his successor in the office of collector of internal revenue. In the light of the authorities, it seems clear that the executor may properly be substituted. An action for the recovery of taxes illegally collected is based on the collector's personal liability resulting from the receipt of money wrongfully exacted by him; hence it cannot be initiated against a successor in office who had no part in the collection or disbursement of the taxes, nor, despite the Act of February 8, 1899 (30 Stat. 822 [28 USCA § 780·note]), can it be continued against such successor in office. Smietanka v. Indiana Steel Co., 257 U. S. 1, 5, 42 S. Ct. 1, 66 L. Ed.

99; Union Trust Co. v. Wardell, 258 U. S. 537, 542, 42 S. Ct. 393, 66 L. Ed. 753. Although the Act of February 8, 1899, was amended in 1925 (43 Stat. 941 [28 USCA § 780]), we see nothing in the amendment to cause a change in the rule of the Wardell Case. That question, however, need not be now determined, for there has been no effort to bring in the defendant's successor in office. That the cause of action survived against the defendant's executor is settled by Patton v. Brady, 184 U. S. 608, 22 S. Ct. 493, 46 L. Ed. 713. Hence Rule 17 of this court is applicable, permitting the personal representative of the deceased party to come in voluntarily.

■ The taxes in dispute were assessed and collected under section 1000 of the Revenue Act of 1921 (42 Stat. 294). They were paid voluntarily, but, as the plaintiff now asserts, erroneously. Claims for refund having been rejected, this suit resulted. The sole question it presents is the same as that discussed in Home Title Ins. Co. v. United States (C. C. A.) 50 F.(2d) 107, this day decided, namely, whether the plaintiff is to be deemed an insurance company within the meaning of section 246 of the Revenue Act of 1921 (42 Stat. 262). The facts in the two cases are, however, somewhat different.

The main difference is that Lawyers' Mortgage Company, unlike the plaintiff in the other case, issues no policies of title insurance. It was incorporated in 1893 under article 5 of the Insurance Law of the state of New York (Laws N. Y. 1892, c. 690), pertaining to title and credit guaranty corporations, and it is subject to supervision by the insurance department of the state, with the requirements of which it has always complied. Prior to amendment of its charter in 1913, its sole business was issuing policies of mortgage insurance; that is, policies guaranteeing payment of existing mortgages owned by the persons applying for its policies. In that year the statute under which it was incorporated was amended to permit mortgage guaranty companies to invest their own funds in mortgages and to sell the same accompanied by the company's guaranty. N. Y. Laws 1913, c. 215. Plaintiff's charter was amended accordingly, and during the taxable years in question the main part of its business was done by making mortgage loans in its own name and selling them to investors, accompanied by its guaranty, and only a small percentage of its business was issuing policies guaranteeing mortgages it had never owned.

Thus the bulk of its business was such as might lawfully be done by a corporation organized under the Banking Law of New York (Consol. Laws N. Y. c. 2), and subject to supervision by the state banking department rather than the insurance department.

Plaintiff's loans were made on application by prospective borrowers, and, when the loan was closed, the borrower received the face amount of his bond and mortgage less plaintiff's charges, consisting of disbursements, chiefly the cost of procuring title insurance from a title insurance company, and of a lending fee, or, on the renewal of a mortgage, an extension fee. Such lending fees and extension fees included plaintiff's charges for appraisals, and were at the prevailing rates charged by other lenders. In disposing of its mortgages, plaintiff either assigned the bond and mortgage in its entirety, accompanied by its regular policy of mortgage guaranty, or assigned fractional interests or participations in a specified mortgage, in which case it issued to the purchaser its "Guaranteed First Mortgage Certificate," which combined an assignment of a fractional interest in the specified bond and mortgage and a guaranty similar in terms to plaintiff's regular policy of guaranty. In either event plaintiff made no profit on the sale, but sold for the face amount of the mortgage. Its primary purpose in making such loans was not investment, but sale at face value, accompanied by its guaranty.

By the terms of its policy, which is the same whether or not plaintiff sells the mortgage to the holder of its policy, it guarantees to the holder payment of interest at a specified rate within five days after it becomes due under the mortgage, and payment of the principal as and when collected, but in any event within eighteen months after written demand by the policyholder, provided his demand is made after the principal has become due under the terms of the mortgage. By accepting the policy, the holder appoints plaintiff his agent to collect interest and principal as it falls due under the mortgage, authorizes plaintiff to retain interest collected in excess of the guaranteed rate, usually one-half of 1 per cent., as the "premium" for its guaranty, and agrees that, upon payment by plaintiff of the principal of the mortgage after it has become due, the bond and mortgage are to be assigned to plaintiff.

Commencing with the year 1921, there was a marked increase in building activity in New York City, and a corresponding increase

in the demand for mortgage loans, especially building loans. During the taxable years in question, plaintiff's income derived from lending fees and extension fees, was nearly half of its total income, and was considerably greater than its "premium" income, and more than twice its "interest" income.

The appellant's contentions are, first, that plaintiff does no insurance whatever, because its policy of guaranty is not a contract of insurance; and, second, that, even if the guaranteeing of mortgages be deemed insurance, it was but incidental to dealing in investments, which constituted the great bulk of plaintiff's business.

It is to be noted that the first contention is as applicable to the guaranty of mortgages which plaintiff has never owned as to those which it sells accompanied by its guaranty. In effect the argument denies the possibility of mortgage insurance, if the "insurer" promises unconditionally to pay the interest and principal upon specified dates whether or not they have been collected from the mortgagor. The argument is too verbal to persuade us. The risk of noncollection is assumed by plaintiff in return for the "premium" reserved out of interest collected. The business of assuming such risks we have held to be insurance for reasons more fully stated in Home Title Ins. Co. v. United States, supra.

The second contention is likewise not sustainable, and was also dealt with in the case last mentioned. Plaintiff made and sold mortgage loans not to make profit on the sales, for there was none, but to enable it to guarantee the mortgages. Its profits lay in its "premiums" and in its lending and extension fees. Such fees we regard as incidental to its business of insuring mortgages. It is true that during the years in question this item grew to enormous proportions, becoming substantially as large as the combined income from premiums and interest. Are we to say that this made plaintiff any less an insurance company? We think not. These incidental fees were the outgrowth of the genuine business of insurance and in earlier years had constituted but a small part of its income. Their tremendous increase in the years in question was during a period of great activity in building loans. Premiums also mounted, but not in like proportion, for they, being based upon interest, were extended throughout the term of the mortgage, while the incidental fees were collected in bulk when the loan was made. It would be possible to say that companies should shift in and out of the class of insurers according as such an in-

cidental item of their income rises or falls. But, as the District Judge pointed out, such a result would have disadvantages from the standpoint of administering the tax law, and is not a result likely to have been intended by Congress when the character of the taxpayer's business has not changed, and the only difference arises from the sudden flaring of what had previously been clearly an incident. Consequently, although the facts here presented are somewhat less favorable for the taxpayer than they were in the Home Title Insurance Company Case, the result should be the same, and the judgment is affirmed.

CHASE, Circuit Judge (dissenting).

In doing that portion of its business which it claims gives it the standing of an insurance company for purposes of taxation, the plaintiff uses some of the language of insurance and of bargain and sale to put into being what seems to me, at least, no more than the obligation of a borrower on collateral security toward its so-called purchasers of mortgages. It has painted a word picture that creates an illusion of insurance, but the language is so transparent that it should not be allowed to obscure the real obligations assumed.

What this plaintiff really does is to lend money, in the first instance, on the security of real estate first mortgages which it approves and is paid by the borrower for approving. It then becomes necessary for it to tap the reservoir of money controlled by the investing public to replenish its funds for use for additional lending on first mortgages on real estate. To do this, it goes through the form of selling all, or a share only, of a mortgage it holds to some one who is willing to invest money at a rate of return one-half of 1 per cent. less than the plaintiff receives on its mortgage. In this way, it gets back the face amount of its mortgage in cash, often, if not always, more than it has withdrawn from its own funds to take the mortgage, as the fees charged its borrower have been deducted from the face of the loan it has made, and retains all its rights under the mortgage it appears to sell, including, of course, the sole right to collect both principal and interest. It has merely subjected the mortgage to reach by the "purchaser" in the event only that the plaintiff ultimately fails to repay that "purchaser" as it has promised. There can be no such default by the plaintiff until the expiration of a period of grace after the due dates of the mortgage both as to principal and interest; that is, its own obligation

is fixed in time by a reference to the due dates of the mortgage. But, if it does not pay as it has agreed, it is as much in default if the mortgage has been fully paid and discharged as if it has not.

Although use is made of an elaborate verbal means to bring in the money the plaintiff uses in its business and it collects fees and "premiums" as the successive steps are taken both to place money on real estate loans and to obtain money to be so placed, the insurance business, which my brothers see so clearly, appears to me to be only an investment business disguised as insurance. Because of its own high credit and the borrowing power resulting from that, the plaintiff can, and does, become a borrower itself to the extent of the full face value of the mortgage it has obtained in making its loan and at a lower rate of interest than its own borrower has to pay, and this, upon no additional security than that of the mortgage it holds. Mere enlargement of business and the multiplication of such transactions can neither serve to spread the risk nor result in insurance of any kind, unless it can be said that the credit of a large and frequent borrower who makes a business of lending the money borrowed is for that reason alone better than the credit of one whose transactions of that nature are comparatively small and few; and so, for some reason I cannot perceive, one who lends to the former gets some kind of insurance by volume. What one of the plaintiff's "purchasers" gets is the promise of the plaintiff to pay unconditionally and this absolute obligation, unrelated to any default by the mortgagor, accrues merely with the lapse of time. The financial responsibility of the plaintiff is fortified by the security of the mortgage. Whatever recognition of the rights of a purchaser of a mortgage are first written into the contract, the plaintiff calls a policy and gives to those from whom it obtains money to use in its business are all written out before the end. The result is that a policyholder has only the primary obligation of the plaintiff to repay the principal of the loan it has received; to pay the agreed rate of interest on it; and, by operation of law, the right to look to the collateral security of the mortgage if the plaintiff defaults.

The taxes the plaintiff has already paid were lawfully assessed and collected.

I would reverse the judgment and remand, with directions to enter judgment for the defendant.