**DINEEN, State Superintendent of Insurance, v. UNITED STATES.**

District Court, S. D. New York.

Feb. 7, 1945.

Samuel Markowitz, of New York City, for plaintiff.

James B M. McNally, U. S. Atty., of New York City (Joseph C. Kenney, Asst. U. S. Atty., of New York City, of counsel), for defendant.

NEVIN, District Judge (sitting by designation).

In this action plaintiff seeks to recover from the United States of America, de-. fendant herein, the sum of $126,576.12, on account of income taxes which plaintiff alleges were erroneously and illegally assessed and collected by the defendant from Lawyers Mortgage Company, for the calendar year 1931.

Plaintiff is the Superintendent of Insurance of the State of New York and, as such, is the liquidator of Lawyers Mortgage Company, a New York corporation, organized under the insurance law of the State of New York on February 9, 1893, and authorized to do a mortgage guarantee business. It is not a life or mutual insurance company.

Trial by Jury having been waived by written stipulation of the parties, the cause was heard by the Court. At the conclu-sion of plaintiff's case, defendant moved for dismissal of the complaint upon the grounds and for the reasons set forth in the record. The Court reserved decision on this motion. It is here and now overruled.

The statute herein involved is Section 204 of the Revenue Act of 1928, c. 852, 45 Stat. 791, 26 U.S.C.A. Int.Rev.Acts, page 412.

The issue raised by the pleadings and at the trial is: Did the business carried on by Lawyers Mortgage Company during the year 1931 constitute that company an insurance company within the meaning of the Act just referred to?

On the same day, to-wit, March 14, 1932, the Supreme Court of the United States decided two cases involving the question of what constitutes an insurance company other than life and mutual, within the meaning of the Revenue Act. ·

In one case, United States v. Home Title Insurance Co., 285 U.S. 191, 52 S.Ct. 319, 76 L.Ed. 695, the Supreme Court held that the company was taxable as an insurance company other than life or mutual and in the other, Bowers v. Lawyers Mortgage Co. 285 U.S. 182, 52 S.Ct. 350, 76 L.Ed. 690 the Court held that the company was not taxable as an insurance company.

In this latter case, the District Court found in favor of Lawyers Mortgage Company, and entered judgment accordingly, Lawyers Mortgage Co. v. Bowers, D.C., 34 F.2d 504. This judgment was affirmed by the Court of Appeals, Lawyers Mortgage Co., v. Bowers, 2 Cir., 50 F.2d 104. It was reversed by the Supreme Court in the case of Bowers v. Lawyers Mortgage Co. just above referred to. The defendant in error in. that (Supreme Court) case is the same company as the company for which the plaintiff in this proceeding is acting as liquidator.

In the Bowers case (285 U.S. at page 188, 52 S.Ct. 353, 76 L.Ed. 690) the Supreme Court holds that whether or not a corporation is taxable as an insurance company, is to be determined by the character of the business actually done in the tax years, saying: "While name, charter powers, and subjection to state insurance laws have significance as to the business which a corporation is authorized and intends to carry on, the character of the business actually done in the tax years determines whether it was taxable as an insur-

ance company. United States v. Phellis, 257 U.S. 156, 168, 42 S.Ct. 63, 66 L.Ed. 180; Weiss v. Stearn, 265 U.S. 242, 254, 44 S.Ct. 490, 68 L.Ed. 1001, 33 A.L.R. 520." And the Court concluded that: "In the case before us respondent's charter authority extended not only to the business of insurance but also to other lines including that of investment with or without guaranties as it might choose. As above shown, the element of guaranty involved in its transactions in the tax years was not sufficient to make it an insurance company."

In the case of Home Title Insurance Co. (285 U.S. at page 195, 52 S.Ct. 321, 76 L. Ed. 695) the Court states: "The amounts received as compensation for insuring title, for guaranteeing that mortgages are first liens, and for guaranteeing payment, constitute the larger part of respondent's income. And, when there are added the fees and charges for examination of title, appraisals, and other services incident to its insurance business, the total properly assignable to that business amounts to more than 75 per cent. of all respondent's income. Undeniably insurance is its principal business. Indeed, it does not appear that any substantial part of its transactions was not connected with or the outgrowth of insurance." And in that case the court concludes that: "The admitted facts clearly show that in the tax years above mentioned respondent was an 'insurance company' within the meaning of that phrase as commonly understood and as used in the Revenue Acts of 1921 and 1924. It was taxable under section 246 and therefore exempt from capital stock taxes."

Plaintiff submits that the Supreme Court decision in the Bowers case covered the years 1922 and 1923 and that "we are now concerned with a situation almost ten years later"; that under the decisions in order to determine whether a company is taxable for any year as an insurance company, it is necessary first, to determine the character of the business transacted by it during that year, and that it is evident (from the decisions) that the determination of classification of an insurance company other than life or mutual under the Revenue Act, is based solely upon the proportion that the taxable income consisting of investment income, plus underwriting income, bears to the total gross income for the year involved, and plaintiff urges that: "During the year 1931, Lawyers Mortgage Company was engaged principally in the business of guaranteeing the payment of principal and interest of bonds secured by real estate first mortgages sold by it prior to that year, extending and renewing its guarantee on mortgages which matured in that year, making new mortgage loans on real estate and guaranteeing the payment of the principal and interest on such mortgage loans upon their sale by it in that year, investing its capital funds in real estate mortgage loans, some to be held for its guaranty fund as required by the New York Insurance Law, and the remainder to be held for sale with its guarantee, and operating the real estate acquired upon foreclosure of mortgages guaranteed by it and the real estate used for its own office buildings."

Plaintiff offered evidence by way of exhibits and otherwise, with respect to its income for the year 1931, which he asserts supports his contention that the company was an insurance company other than life or mutual for the year 1931, whatever its classification may have been in any prior year.

It is the contention of the Government that the business of Lawyers Mortgage Company during the year 1931, varied in no substantial way from the years 1922 and 1923 and, therefore, that it was not in 1931, an insurance company within the meaning of the Revenue Act. Counsel for the Government stated in the record defendants' claim as follows:

"It is true that the Supreme Court has in these cases (Bowers and Home Title Co. cases supra) stated in substance that the guarantee of principal and interest on mortgaged loans constitutes insurance. It is the Government's contention, based on investigation of the books of Lawyers Mortgage Company, that the so-called guaranteeing done by Lawyers Mortgage Company did not, as a matter of fact, constitute insurance, and in fact did not even constitute a guarantee; that all that Lawyers Mortgage Company did was to assume, in every instance where it sold a certificate or a policy, a direct primary liability, totally independent of any mortgage, and in fact deprived the purchasers of the certificates of any rights which they might have had except interests in the mortgage as collateral security.

"The Government contends that if you take Section 204, the Revenue Act of 1928, and apply it to the figures in the income tax return filed by Lawyers Mortgage

Company, in conjunction with the books of Lawyers Mortgage Company, and revise the figures so as to subtract, for example, from the premiums the proper deductions in accordance with that statute to determine the exact amount of underwriting income, it develops that even applying this statute under which this plaintiff believes Lawyers Mortgage Company should have paid, that a very minor percentage of the income of Lawyers Mortgage Company came from this so-called insurance business."

The record in the instant case shows that Lawyers Mortgage Company in 1931, as in 1922 and 1923, "did not assign or apportion its assets to any particular part of the business" but used them indiscriminately in its different activities; that it kept on hand sufficient bonds and mortgages to maintain the guarantee fund required by the insurance laws; and that in the year 1931 as in the years 1922 and 1923 corporations organized under the New York Banking Laws and subject to the Banking Department of the State of New York carried on a business of the same or a similar general character as that carried on by Lawyers Mortgage Company. Compare Bowers case, supra, 285 U.S. 182 at page 186, 52 S.Ct. 350, 76 L.Ed. 690.

During the year 1931, Lawyers Mortgage Company never issued policies of guarantee on any mortgage liens which it did not itself make or sell.

Mr. Raynor, Secretary of Lawyers Mortgage Company, and himself a lawyer, called as a witness on behalf of plaintiff, testified that as between the years 1922 and 1923 and the year 1931 "in the general nature there was no difference * * * in the character of the business, the nature of the business," of Lawyers Mortgage Company.

Substantially all of the facts were agreed to by the parties in a written stipulation filed herein. The stipulation provided that either party could introduce further competent evidence at the trial and some additional evidence was offered and admitted.

This evidence the court has considered along with the facts as stipulated. Having so done, the court has reached the conclusion that, as claimed by the Government, plaintiff has failed to prove that the business carried on by Lawyers Mortgage Company during the year 1931 constituted that company an insurance company within the meaning of Section 204 of the Revenue Act of 1928.

The Court has adopted the Facts as stipulated as part of its Findings of Fact herein (1 to 24, inc.,) adding thereto a further Finding, numbered 25.

Upon a consideration of the whole of the record, the briefs and arguments of counsel, and the applicable law, the Court has arrived at the following:

Findings of Fact:

1. This is an action at law for the recovery of $126,576.12 of income tax alleged to have been erroneously and illegally assessed and collected by the defendant from Lawyers Mortgage Company, (hereinafter referred to as the "Company") for the calendar year 1931.

2. Plaintiff is the Superintendent of Insurance of the State of New York, duly acting as successor liquidator of the Lawyers Mortgage Company.

3. Lawyers Mortgage Company was, at all times herein mentioned, a domestic corporation organized and existing under the laws of the State of New York, to-wit, the then existing Article V of the Insurance Law of the State of New York, Consol. Laws 1909, c. 28, with its principal office and place of business in the Borough of Manhattan, New York City, in the Southern District of New York.

4. The Company was organized on or about February 9, 1893, as Lawyers Mortgage Insurance Company. Upon application by Lawyers Mortgage Insurance Company and by order of the Supreme Court of the State of New York, entered October 3, 1903, the name of the Company was changed to Lawyers Mortgage Company.

5. On or about January 10, 1905, the Company amended its charter to provide relative to its charter powers as follows: "To examine titles to real property and chattels real, to procure and furnish information in relation thereto, make and guarantee the correctness of searches for all instruments, liens or charges affecting the same, guarantee or insure the payment of bonds and mortgages and guarantee and insure the owners of real property and chattels real and others interested therein against the loss by reason of defective titles thereto and other incumbrances thereon."

6. On or about December 18, 1913, the Company further amended its certificate of incorporation to read as follows:

"To examine titles to real property and chattels real, to procure and furnish information in relation thereto, make and guarantee the correctness of searches for all instruments, liens or charges affecting the same, guarantee or insure the payment of bonds and mortgages, or notes of individuals or partnerships secured by mortgages upon real property situated in this or any other state, and bonds, notes, debentures and other evidences of indebtedness of solvent corporations secured by deed of trust or mortgage upon real property situated in this or any other state, invest in, purchase and sell, with such guarantee or with guarantee only against loss by reason of defective title or incumbrances, bonds and mortgages, and notes of individuals or partnerships secured by mortgages upon improved and unincumbered real property situated in this or any other state worth fifth per centum more than the amount loaned thereon, and bonds, notes, debentures and other evidences of indebtedness of solvent corporations secured by deed of trust or mortgages upon improved and unincumbered real property situated in this state or outside of this state worth fifty per centum more than the amount loaned thereon, and guarantee and insure the owners of real property and chattels real and others interested therein against the loss by reason of defective titles thereto and other incumbrances thereon."

Under the certificate of incorporation, as so amended, the Company was doing business during the year 1931.

7. From about May 4, 1931, to about May 10, 1935, George S. Van Schaick was Superintendent of Insurance of the State of New York, pursuant to appointment made under the New York Insurance Law, under which appointment he acted as Superintendent of Insurance of the State of New York.

8. On or about August 2, 1933, an order of the Supreme Court of the State of New York was made and entered in the office of the Clerk of the County of New York, wherein the said George S. Van Schaick and his successors in office, as Superintendents of Insurance of the State of New York, were authorized and directed to take possession of the property of the Company, conduct its business, rehabilitate the same pursuant to the provisions of the then Article XI of the Insurance Law of the State of New York, Laws 1932, c. 191, Consol. Laws, c. 28, and all other provisions of law applicable thereto, and deal with the property and business of the Company in its name, and thereupon the said George S. Van Schaick, as Superintendent of Insurance, took possession of the property and business of the Company and proceeded to rehabilitate its affairs and deal with its property in its name, as Rehabilitator.

9. On or about December 18, 1933, Richard A. Brennan was appointed and designated by the said George S. Van Schaick Special Deputy Superintendent of Insurance, to act as his Statutory Agent in the rehabilitation of the Company. Thereafter and until October 23, 1934, the said Richard A. Brennan acted as such Statutory Agent.

10. Louis H. Pink, the original plaintiff herein, became the Superintendent of Insurance of the State of New York on May 10, 1935, as successor to the said George S. Van Schaick, and by virtue of such appointment became the successor rehabilitator of the Company.

11. On or about November 17, 1937, an order of the Supreme Court of the State of New York was made and entered in the office of the Clerk of the County of New York, wherein it was ordered, adjudged and decreed that the Company be placed in liquidation. In and by said order it was further provided that Louis H. Pink, the original plaintiff herein, or his successors in office, as Superintendents of Insurance of the State of New York, forthwith take possession of the property and liquidate the business of the Company, pursuant to the provisions of the then Article XI of the Insurance Law of the State of New York and all other provisions of law applicable thereto; and by said order the said Louis H. Pink, or his successors in office, as Superintendents of Insurance of the State of New York, were vested with title to all property, contracts and rights of action of the Company and were directed to deal with the said property and business of the Company in the name of the Superintendent of Insurance of the State of New York. The original plaintiff, as such Superintendent of Insurance, upon the entry of the said order, took possession of the property, contracts, rights of action and business of the Company and proceeded to liquidate its affairs.

12. On or about November 17, 1937, Ralph B. Romaine was appointed and designated by the said Louis H. Pink Special Deputy Superintendent of Insurance, to act

as his Statutory Agent in the liquidation of the Company, and until about October 15, 1941, the said Ralph B. Romaine was acting as such Statutory Agent.

13. Robert E. Dineen, the present plaintiff herein, became the Superintendent of Insurance of the State of New York on September 23, 1943, as successor to the said Louis H. Pink, and by virtue of such appointment became and now is the successor liquidator of the Company.

14. The defendant, at all times herein mentioned, was and now is a corporation sovereign and body politic.

15. Charles W. Anderson was Collector of Internal Revenue for the Third District of New York from April 1, 1923, until July 6, 1934.

16. On or about March 14, 1932, the Company filed with Charles W. Anderson, the then Collector of Internal Revenue for the Third District of New York, its income tax return for the calendar year 1931, on the official form prescribed therefor by the Treasury Department, showing total gross income of $3,865,414.66, total deductions of $1,593,579.71, net taxable income of $2,271,834.95 and a total tax of $272,620.19. In said income tax return filed for the year 1931, the Company consolidated with its own income and deductions, the gross income and deductions of subsidiary companies.

17. During the year 1932, the Company paid to Charles W. Anderson, as Collector of Internal Revenue for the Third District of New York, the above amount of income tax of $272,620.19, for the calendar year 1931, in installments in the amounts and on the dates, as follows:

| | |
|---|---|
| $68,155.05 | March 14, 1932 |
| $68,155.05 | June 14, 1932 |
| $68,155.05 | September 14, 1932 |
| $68,155.05 | December 14, 1932 |

which amount the United States of America has received from the said Collector of Internal Revenue as in the usual course of his official business, and still retains.

18. Charles W. Anderson, to whom the aforesaid income tax of $272,620.19 was paid, is not now, and since July 6, 1934, has not been, in office as Collector of Internal Revenue.

19. Since the date of its incorporation in 1893 and including the year 1931, the Company always has been and is subject to examination by and supervision of the Superintendent of Insurance of the State of New York, has always been and is subject to the provisions of the Insurance Law of the State of New York applicable to title and credit guaranty corporations organized thereunder, has always been and is subject to the regulations of the Superintendent of Insurance of the State of New York, and has always been required to file and has filed annually (until the entry of the aforesaid rehabilitation order) with the Superintendent of Insurance of the State of New York, on forms approved by him, the statements required by him for each year.

20. The amount of mortgages and mortgage certificates guaranteed by the Company outstanding at the end of the year 1922 was $149,433,293, and outstanding at the end of the year 1931 was $434,870,083.

21. On September 13, 1934, the Company by the then Superintendent of Insurance of the State of New York, then acting as Rehabilitator of the Company, filed with the Collector of Internal Revenue for the Third District of New York, at New York City, for transmission to the Commissioner of Internal Revenue of the United States, a written claim for refund of $136,310.10 of income tax paid for the year 1931.

22. Although more than six months have elapsed since the filing of the written claim for refund, the Commissioner of Internal Revenue has neither rejected nor allowed the claim for refund, nor any part thereof.

23. No part of the aforesaid tax of $272,620.19 paid by the Company for the year 1931 to Charles W. Anderson, as Collector of Internal Revenue, has been refunded or credited to the Company, or the plaintiff, or his predecessors.

24. Plaintiff is the sole owner of the aforesaid claim as Superintendent of Insurance of the State of New York, as Liquidator of the Company, and since his appointment as Superintendent of Insurance of the State of New York he has been, as Liquidator of the Company, and prior thereto, his predecessors as Superintendents of Insurance of the State of New York, as Liquidator or as Rehabilitator of the Company, and the Company, were and always had been respectively the sole owners of the aforesaid claim, and neither he, nor his said predecessors, nor the Company, has or have ever assigned or transferred the whole or any part thereof, or interest therein, and he and his said predeces-

sors and the Company have at all times borne true allegiance to the Government of the United States and have in no way voluntarily aided, abetted or given encouragement to rebellion against the said Government.

25. The business carried on by Lawyers Mortgage Company during the year 1931 was substantially as follows:

Upon receiving an application for a loan it caused an appraisal of the proposed real estate security to be made and procured a title insurance company to certify the property, make a report as to title and insure the same. The person borrowing money from the company, having executed and delivered a bond and mortgage to the company, received from it an amount specified therein, less charges for title insurance, survey, disbursements and recording taxes.

There was also subtracted from the amount given to the borrower by the company, a lending fee, some portion of which appears to have represented an appraisal charge. The appraisals were carried on by employees of the company, who worked on a salary basis.

The loan would be sold either in its entirety or in parts. When the loan was sold as a whole, Lawyers Mortgage Company delivered to the purchaser a contract called a "policy of mortgage guarantee." When a part of the loan was sold, a participation certificate was given to the purchaser indicative of the amount which he had paid therefor and purporting to represent his interest in the whole mortgage.

The "policies" and the certificates by their terms required the holders thereof by accepting the same from the company, to assign to the company all the rights in which they might share as mortgagees or assignees of the mortgages. Each "policy" or certificate contained a so-called guarantee by which Lawyers Mortgage Company guaranteed the payment of the principal amount thereof, as and when collected, but in any event within eighteen months following written demand made after maturity of the "policy" or certificate. Almost invariably the maturity date of the "policy" or certificate coincided with the maturity date of the mortgage loan with which it was connected.

The company further guaranteed the payment of interest to the purchaser of the "policy" or certificate at regular periods and at an agreed rate. This rate was usually ½ of 1% less than that specified in the bond and mortgage, but in some instances at least, the rate paid to the person purchasing from Lawyers Mortgage Company was identical with the rate received by Lawyers Mortgage Company from the original borrower. Where the differential of ½ of 1% existed between the interest rate paid by the borrower and the interest rate paid by Lawyers Mortgage Company to the purchasers of "policies" and certificates, the company retained the difference and called it "premium." The company also retained the interest accruing between the making of loans on mortgage security and the sale of the "policies" and certificates. It also charged extension fees to the borrowers for the renewal of loans at the maturity dates of the bonds and mortgages.

The company made no assignment or apportionment of assets or income to the different parts of its business, but used them indiscriminately in its different activities. No part or portion of the expense of its various activities (e.g.) appraisement, bookkeeping, sales of certificates, preparation of documents, etc., was charged against any specific source of income.

The company at all times throughout the year 1931 owned first mortgages which were available for its guaranty fund pursuant to the then effective Section 173 of the Insurance Law of the State of New York, Chapter 290, Laws of 1929, Consol. Laws, c. 28. No specific mortgages were ever earmarked or segregated as being applicable to the guaranty fund. The statute in question did not require any segregation. No portion of the so-called "premium" described above was ever allocated under insurance risk.

Conclusions of Law:

1. This Court has jurisdiction of the subject matter of this action and the parties are properly before it.

2. The character of the business carried on by Lawyers Mortgage Company during the year 1931 did not differ from the character of the business carried on by Lawyers Mortgage Company during the years 1922 and 1923.

3. The contracts between Lawyers Mortgage Company and the purchasers of whole mortgages or mortgage certificates from that company, while they may have contained some element of insurance, did not constitute the business of the company, an insurance business.

4. Lawyers Mortgage Company during the year 1931 was not an insurance company within the meaning of Section 204 of the Revenue Act of 1928.

5. The complaint should be dismissed at plaintiff's costs.

Judgment accordingly.